**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| Jane Doe 2[1] by and through her mother, Mary Doe, <br><br> Plaintiff, <br> v. <br><br> Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, Inc., U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation, USA Federation for Sport Cheering d/b/a USA Cheer, Charlesbank Capital Partners, LP, Bain Capital, LP, Jeff Webb, individually, Champion Elite Legacy, LLC, Ashley Hughes, and Erick Kristianson, <br><br> Defendants. | **COMPLAINT** <br> **(DEMAND FOR A JURY TRIAL)** |

## STATEMENT OF THE CASE

Plaintiff files this complaint by and through undersigned counsel of record against the above-named Defendants for money damages in connection with conduct: (1) in violation of the Protecting Young Victims from Sexual Abuse and

---

[1] Given the nature of the subject matter as well as the potential for harm that exists against those who come forward to inform against Defendants, the Plaintiff in this matter will be identified only as Jane Doe in conjunction with the factual underpinnings on this complaint.

Safe Sport Authorization Act of 2017, 18 U.S.C. §2255; (2) constituting a civil conspiracy in violation of the Racketeer Influenced and Corrupt Organization (RICO) Act, Title IX of the Organized Crime Control Act of 1970, 18 U.S.C. §1962(c) and (3) giving rise to common law claims of gross negligence, negligent supervision, and assault/battery; and (4) constituting violations of contractual and/or equitable responsibilities owed to Plaintiff.  As a direct and proximate result of Defendants' collective and individual conduct, Plaintiff sustained and will continue to sustain actual and ongoing injuries and damages, and in support thereof, she alleges as follows:

## **INTRODUCTION**

1.     At all times relevant to this complaint, Champion Elite Legacy, LLC ("Defendant Champion Elite") was a private All-star cheer and tumbling business in South Daytona, Florida offering coaching and training services for athletes of all ages, including Plaintiff Jane Doe 2.

2.     At all times relevant to this complaint, Champion Elite Legacy, LLC, by and through its owner, Defendant Ashley Hughes, employed and empowered an All-star coach, Erick Kristianson ("Defendant Kristianson"), to train young

athletes, providing Kristianson with access to these same athletes, and opportunities to create relationships and connections with these athletes.

3.      During the relevant timeframe, Defendant Champion Elite was considered a member club and/or working in a consortium with Defendants Varsity Brands, LLC, Varsity Spirit, LLC, Varsity Brands Holding Company, (collectively "the Varsity Defendants") and the Varsity Defendants' owners and affiliates, including Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation ("Defendant USASF"), Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer"), Defendant Bain Capital, Defendant Charlesbank, and Defendant Jeff Webb to expand the Varsity Defendants' network of minor athletes and prop up the Varsity Defendants' billion-dollar business.

4.      Similarly, during the relevant timeframe, Defendant Kristianson, was considered a certified coach by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and Defendants Bain Capital and Charlesbank, a classification that essentially identified Kristianson as a duly vetted and safe coach for working with minor children, such as Plaintiff Jane Doe 2.

5.       During the relevant timeframe, and upon information and belief, Defendant Champion Elite, Defendant Hughes, and Defendant Kristianson were

part of a network of gyms, owners, coaches and vendors empowered and placed in positions of trust and authority by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Webb, Defendant Bain Capital, and Defendant Charlesbank.

6.     At the same time, and upon information and belief, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Webb, Defendant Charlesbank and Defendant Bain knew or had the opportunity to know that Defendants Champion Elite, Defendant Hughes, and Defendant Kristianson were engaged in significant misconduct or abuse of minor athletes, or were allowing pervasive abuse and misconduct against minor athletes.

7.     Upon information and belief, the scheme to anoint specific gyms and coaches at the expense of safety best practices occurred as the Varsity Defendants were creating and expanding a business model reliant upon a pipeline of young athletes, each of whom was a participant of a member gym, such as Defendant Champion Elite, and each of whom represented a significant contribution to the Varsity Defendants' business worth billions of dollars.

8.     As set forth in this complaint, the Defendants, together and individually have knowingly, or with a reckless disregard, created, organized, and

4

propagated a system of young-athlete abuse against innocent victims including Plaintiff Jane Doe 2.

9.      This is a complaint for legal and equitable relief for the victims of this scheme.

## JURISDICTION, PARTIES, AND VENUE

10.     This action arises pursuant to, and involves questions requiring the interpretation of the laws of the United States and thus subject matter jurisdiction is conferred upon the Court by 28 U.S.C. §1331.

11.     Supplemental jurisdiction over state law claims is conferred upon the Court by 28 U.S.C. §1367(a).

12.     At all times relevant to this complaint, Plaintiff Jane Doe 2 has been a citizen and resident of Florida in Volusia County.

13.     At all times relevant to this complaint, Defendant Champion Elite Legacy, LLC ("Defendant Champion Elite") was a for-profit entity organized and existing pursuant to Florida law, with a principal place of business at **2330 S Nova Road #15, South Daytona, Florida 32119**. At all times relevant to this complaint, Defendant Champion Elite was a premier All-star cheer program, a USASF member club, and, by and through its employees, owners, agents, and authorized

representatives, all within the course and scope of their responsibilities, did interact on a daily basis with minor children, both upon its premises, as well as at various camps, clinics, and competitions throughout the country.

14.     Upon information and belief, at all times relevant to this complaint, Defendant Ashley Hughes ("Defendant Hughes") owned and operated Defendant Champion Elite, and was a citizen and resident of Volusia County, Florida. As the owner and operator of a business providing All-star training and competition services to minor athletes, which necessarily included the transport of these minor athletes across state lines, Defendant Hughes had a responsibility to provide safe premises, personnel, and modes of training to minor athletes, including, without limitation Jane Doe 2.

15.     Upon information and belief, and at all times relevant to this complaint, Defendant Erick Kristianson was a citizen and resident of South Daytona, Florida and was employed by Defendant Champion Elite. During the timeframe of this complaint, Defendant Kristianson was credentialed by USASF, and as such was expressly permitted to interact with minor children, such as Plaintiff Jane Doe 2.

16.     At all times relevant to this complaint, Defendant Jeff Webb ("Defendant Webb") was a citizen of Memphis, Tennessee, and created, owned, operated, and controlled Defendant Varsity Brands, LLC, Defendant Varsity Spirit, LLC, Defendant Varsity Brands Holding Company, Inc., Defendant USASF, and Defendant USA Cheer, all of which did business throughout the United States.

17.     At all times relevant to this complaint, Defendant Varsity Brands, LLC (f/k/a Varsity Brands, Inc.) ("Defendant Varsity Brands") has been a for-profit entity organized under the laws of Delaware with its principal place of business in Memphis, Tennessee. It is the corporate parent company of Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation).

18.     At all times relevant to this complaint, Defendant Varsity Spirit, LLC (f/k/a Varsity Spirit Corporation) ("Defendant Varsity Spirit") has been a for-profit entity organized under the laws of Tennessee with its principal place of business in Memphis, Tennessee. As set forth more fully herein, during the operative timeframe, Defendant Varsity Spirit has been the world's largest purveyor of merchandise, branding, camps, clinics and competitions for the private All-star cheer industry, encompassing as much as 90% of the industry's gyms, coaches, and athletes.

19.     At all times relevant to this complaint, Defendant Varsity Brands Holding Company, Inc. ("Defendant Varsity Brands Holding") has been a for-profit entity organized under the laws of Texas with its principal place of business in Farmers Branch in Dallas County, Texas.

20.     Throughout this complaint, Defendants Varsity Spirit, LLC, Varsity Brands, LLC and Varsity Brands Holding Company, Inc., shall be referred to as the "Varsity Defendants". At all times relevant to this Complaint, either directly or through affiliates, including those wholly owned and/or controlled, the Varsity Defendants organized, promoted, produced, and/or managed merchandise, branding, cheer camps, and competitions throughout the United States including Florida.

21.     At all times relevant to this complaint, Defendant U.S. All Star Federation, Inc. d/b/a U.S. All Star Federation (hereinafter "Defendant USASF") has been a Tennessee non-profit corporation with its principal place of business in Memphis, Tennessee, and the self-proclaimed governing and regulatory body promulgating and enforcing rules for private All-star cheer. As set forth more fully in this complaint, Defendant USASF promotes athlete participation in "sanctioned" events, which are largely events hosted by the Varsity Defendants.

8

At all times relevant hereto, Defendant USASF has been controlled and funded by the Varsity Defendants.

22.     At all times relevant to this Complaint, Defendant USA Federation for Sport Cheering d/b/a USA Cheer ("Defendant USA Cheer") has been a non-profit entity organized and existing in the state of Texas, and the governing body for sport cheering throughout the United States. Defendant USA Cheer is controlled and funded by the Varsity Defendants as described further herein.

23.     At all times relevant to this Complaint, the Varsity Defendants and Defendants USASF and USA Cheer either directly and/or through their affiliates, which they control, have: (a) promulgated and/or enforced rules governing competitive cheer coaching, competitive cheer training, cheer camps and competitions throughout the United States; (b) organized, promoted, produced, and/or managed cheer camps, clinics, and competitions throughout the United States and furthered the goals and purposes of the conspiracy and conduct set forth herein; (c) established guidelines and assessed whether to certify gyms, coaches, and vendors, including without limitation those named herein, as members of USASF and/or USA Cheer, and to otherwise provide "credentials" for these members gyms and affiliates; and (d) required that athletes, coaches, and

clubs purchase annual memberships with Defendant USASF and in order to participate in the Varsity Defendants' sanctioned events.

24.    At all times relevant to this complaint, Defendant Charlesbank Capital Partners, LP (hereinafter "Defendant Charlesbank") has been a for-profit entity organized under the laws of Massachusetts with its principal place of business in Boston, Massachusetts. As set forth herein, and during the relevant timeframe, Defendant Charlesbank has been a minority and/or majority owner of the Varsity Defendants.

25.    At all times relevant to this complaint, Defendant Bain Capital, LP (hereinafter "Defendant Bain Capital") has been a for-profit entity organized under the laws of Massachusetts, with its principal place of business in Boston, Suffolk County, Massachusetts. Since 2018, Defendant Bain Capital has been the majority owner of the Varsity Defendants.

26.    Venue is proper in the United States District Court for the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. §1391 as at least one of the Defendants is a resident of Volusia County, Florida, or a corporation organized and existing, and with a principal place of business in South Daytona, Florida, and

a substantial portion of the acts and omissions complained of occurred in this district.

## FACTUAL ALLEGATIONS

### The Competitive Cheer World

27.    Private All-star cheer is a competitive and dynamic sport where athletes compete in a team setting mixing a variety of disciplines including cheer, dance, and tumble.

28.    In contrast to traditional sideline cheer, where athletes are generally a compliment to another sport, such as football or basketball, All-star competitive cheer is a focus unto itself.

29.    Because of its unregulated nature, All-star cheer is not subject to traditional seasonal limitations, or other restrictions against year-round performance and training.

30.    As such, All-star cheer requires an extreme amount of commitment from athletes and their families, with near constant training, cross-training, and frequent competition travel through multiple seasons throughout the year.

31.    This level of dedication is costly. A single season can, at minimum, cost between $3,000 to $7,000 per team member. Some families spend $20,000 or

more for transportation, lodging, membership and entrance fees, as well as merchandise, uniforms, and other accessories and incidentals, incurred in connection with the numerous competitions the athletes attend throughout the year.

32.     In this space of All-star cheer, the Varsity Defendants have emerged as the pre-eminent business.

33.     In 1971, Defendant Jeff Webb began his work in cheerleading as an employee at the National Cheerleaders Association working for Lawrence Herkimer, known as the original pioneer of cheer.

34.     During his work with Herkimer, Defendant Webb familiarized himself and began forming a plan to monetize the operation of cheerleading "camps" – days-long events where athletes would converge to learn new skills.

35.     In 1974, Defendant Webb left Herkimer and formed his own group, which he similarly named the Universal Cheerleaders Association. By and through Universal Cheerleaders Association, Defendant Webb grew his footprint in the cheer industry, promoting and showcasing his cheer camps, which grew throughout the 1980s.

36.     During the 1980s, Defendant Webb's cheer camp organization transformed into Varsity Spirit.

37.     As with Herkimer's association, Varsity Spirit began as a provider of cheer camps.

38.     Defendant Varsity Spirit, LLC thereafter expanded into competitions, merchandising, branding, social media, and even gym ownership and management.

39.     By the early 2000's, Varsity Brands, Inc. publicly represented itself as:

   a.   The largest designer, marketer, and supplier of cheerleader dance team uniforms and accessories;

   b.   The biggest operator of cheerleading and dance team training camps and clinics;

   c.   A leading organizer of special events for extracurricular activities;

   d.   A major provider of studio dance conventions and competitions; and

   e.   A producer of studio dance apparent for studio dance competitions.[2]

---

[2] See Varsity Brands, Inc., Form 10-K, (Apr. 1, 2002), available at:
https://www.sec.gov/Archives/edgar/data/874786/000093041302001124/c23854_10k.txt

40.     As early as 2002, the largest source of revenue for Varsity Brands, Inc. came from its connection with All-star cheer.

41.     Through their various dealings in the cheer industry, at all times relevant to this complaint, the Varsity Defendants have controlled an estimated 80-90% of the market.

42.     As the Varsity Defendants' footprint in the All-star cheer world expanded, so too, did its ability to obtain revenue from its affiliate gyms.

43.     As of today, and as set forth more fully herein, a substantial portion of the revenue from each individual athlete who cheers for a Varsity affiliate goes directly to the Varsity Defendants.

44.     At all times relevant to this complaint, Defendant Champion Elite was one such Varsity affiliated gym and represented a substantial financial contributor to the Varsity Defendants.

45.     The total competitive cheer industry is estimated to include as many as four million athletes throughout the United States, and is further estimated to generate billions of dollars of revenue annually.

46.     For instance, in or around 2021, Bain Capital reported Defendant Varsity Spirit's annual earnings exceeded $1.3 billion.

47. A huge source of revenue in the All-star world are the cheer camps, clinics, and competitions held locally, regionally, nationally, and even worldwide. These events frequently require athletes to travel across state lines.

48. Today, these events are hosted and conducted under the guidance, certification, and rulemaking of a group of entities created, controlled, and funded by the Varsity Defendants.

49. In 2003, a group of All-star cheerleading coaches formed an independent 501(c)(3) organization, called the National All-Star Cheerleading Coaches Congress (NACCC), to establish uniform rules for all-star cheerleading. The group, which would promote both Varsity and non-Varsity events, met in Atlanta and created the first set of universal all-star cheerleading rules.

50. Within a week, Defendant Jeff Webb founded Defendant USASF.

51. After forming Defendant USASF, Defendant Webb mandated that all-star athletes cheering on behalf of Varsity-affiliated gyms purchase a USASF membership as a requirement to compete at Varsity-sponsored events. Moreover, gyms and coaches who wished to compete at and attend Varsity-sponsored events were also required to become members of USASF.

52.     Within just a few years after the merger, USASF became the exclusive body providing regulatory oversight and enforcement for All-star cheer.

53.     At the same time, in or around 2006, the Varsity Defendants promoted certain all-star member clubs and coaches as being "USASF Certified", a seal that Defendants represented was synonymous with a warranty that the gym, the coach, the choreographer, and any other adult certified by USASF was held to the highest standards, and followed best practices, including to prevent athlete abuse.

54.     Moreover, and upon information and belief, this credentialing served as a signal to parents and athletes that USASF would continually monitor and ensure compliance by its member gyms, coaches, and affiliates.

55.     Meanwhile, USASF member gyms required their athletes to obtain USASF membership and to buy their uniforms, accessories, and other apparel from the Varsity Defendants through their member gym.

56.     The Varsity Defendants require gyms to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity Spirit, LLC for buying their merchandise and for sending athletes to Varsity events.

57.     The Varsity Defendants control every aspect of cheerleading at every level in the United States. The Varsity Defendants even own several gyms and

cheer programs, many of which were failing or mismanaged before Varsity's takeover.

58.   All-star athletes competing on behalf of Varsity-member gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees.

59.   Gyms and coaches likewise pay monthly or annual fees to USASF, USA Cheer and the Varsity Defendants.

60.   The Varsity Defendants and their certified gyms encourage members to pay these fees, dues, and other expenses via auto-draft or credit card.

61.   Athletes who compete on behalf of a Varsity-affiliated gym are precluded from transferring from one Varsity-affiliated gym to another without permission. This restriction in the athlete's ability to select a gym of their choice after initially agreeing to cheer for a Varsity-gym inhibits athletes from reporting misconduct.

62.   To this day, Defendant Webb remains intimately involved and interested in the ongoing affairs of the Varsity Defendants. Jackie Kennedy, Varsity Spirit's VP of marketing, said of Defendant Webb in January of 2019, "Jeff is still teaching and leading camps alongside our summer camp instructors. His

passion permeates into all of the people here at Varsity Spirit, and Jeff cares about every single employee. He takes the time to meet every new employee. He learns their name, where they are from and what they are passionate about."

63.     At all times relevant to this complaint, the Varsity Defendants and their co-conspirators used private All-star cheer gyms like Defendant Champion Elite to gain access to paying athletes and their families, marketing to them that membership in a USASF Certified gym will provide the athlete with access to the highest echelon competitions in the sport under strict safety standards.[3]

64.     Meanwhile, membership in USASF, and with a Varsity-affiliated gym mandates competing in a specified number of annual Varsity events.

65.     The Varsity Defendants encourage gyms to attend a minimum number of events annually in exchange for cash rebates and other incentives.

66.     When attending a Varsity event, members and their families are required to purchase rooms at a designated Varsity-chosen hotel at reportedly inflated prices. Varsity dubs this system "stay-to-play". Upon information and belief, failure by an athlete to adhere to "stay-to-play" could subject the entire team

---

[3] *See* "Sanctioned Competitions," USASF available at: <u>Sanctioned Competitions - Cheer & Dance | USASF</u> ("When All Star clubs attend USASF Sanctioned Competitions, they can be assured their athletes, coaches, and parents are attending events that comply with the sport's best safety practices")

to disqualification.

67.    At many All-star events, the Varsity Defendants sell alcohol.

68.    At each of the events, the Varsity Defendants are aware that minor athletes are staying in the same hotels as adult coaches, choreographers, and vendors, and it is foreseeable that these self-same adults will co-mingle with the minor athletes.

69.    Moreover, and at all times relevant to this complaint, at most of these events, the Varsity Defendants know or have reason to know that minor athletes are being exposed to drugs and alcohol.

70.    In addition to mandating exclusive participation in Varsity events, once young athletes join Varsity-affiliated, USASF All-Star cheer gyms, coaches and other gym staff begin suggesting one-on-one coaching time, or closed choreography time where the parent is not allowed to attend.  This intensive personal training is represented as necessary for an athlete to rise to the next level, compete in higher divisions, win prestige and celebrity status that will enable them to cheer at the collegiate level, and possibly become coaches themselves one day. This system of promoting intensive one-on-one time with the athletes gives coaches and staff increased access to young and impressionable athletes and

corresponds to the athlete which funds the Varsity Defendants' system of camps and competitions, and which creates future generations of Varsity coaches and Varsity-backed gyms.

71.    To encourage even greater athlete participation, the Varsity Defendants, in conjunction with their member gyms, coaches, and vendors, in 2011 created "Cheerlebrity," whereby the Varsity Defendants used their online, social media, and significant industry influence to promote certain gyms and athletes.

72.    "Cheerlebrity" became the impetus behind the Netflix show "Cheer" that propelled Jerry Harris to fame.

73.    "Cheerlebrity" was a competition created by the Varsity Defendants in the image of *American Idol* which sought to promote Varsity All-star gyms and cheerleaders through social media presence.

74.    Upon information and belief, "Cheerlebrity" is one example of marketing and branding that catered specifically to young athletes and was intended to increase young athlete participation and desire to participate in the industry.

75.    Upon information and belief, Defendants Champion Elite and Hughes were well-known in the Varsity Spirit, LLC community, enjoying status

and promotion on the Varsity Defendants' marketing and branding content, including, without limitation, social media materials. As such, and at all times relevant to this complaint, the Varsity Defendants boosted the reputations of Defendants Champion Elite and Hughes in the cheer community to obtain access to new crops of minor athletes, to boost revenues, and to boost Defendant Champion Elite and Defendants Hughes' reputations and footprints in the Varsity world.

76.    To further perpetuate this connection between Varsity-backed athletes and coaches, upon information and belief, the Varsity Defendants encouraged parents to allow their children to travel to gyms, camps and competitions, and to stay with host-families, choreographers, and gym owners, and further encouraged minor athletes to look up to these leaders in their sport.

77.    The Varsity Defendants, Defendant USA Cheer and Defendant USASF tout the safety and security of their affiliate-gyms and coaches, and the Varsity Defendants' competitions, and camps to lull parents into comfort whereby parents have no fear for the safety of their children who train with Varsity-supported coaches, at Varsity-member gyms, and who travel out of state to hotels for competitions throughout the year.

78.     The Varsity gym network also encourages athletes to relocate to sponsor or host families who are either coaches, gym owners, or live near top-ranked Varsity-sponsored gyms.

79.     The system is designed to disassociate the athletes from their families, and foster closeness with the Varsity-sponsored gyms, coaches, and gym owners.

80.     Thus, to perpetuate their scheme to create an unending pipeline of new athletes, coaches, and gym owners, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, Defendant USA Cheer and Defendant USASF rely heavily upon the network of gyms and coaches, such as Defendants Champion Elite, Hughes, and Kristianson going so far as to host conferences specifically for these gym owners and coaches, providing tips and training in fundraising, athlete development, and business management.

81.     "Varsity University," which is "an enterprise powered by Varsity Brands, [and which] offers comprehensive educational programming to schools and athletic programs,"[4] is a nine-course program that encompasses three specific areas: Life Skills, Social Media, and Leadership. Varsity University hosts annual conferences for coaches and gym owners, during which the adults are

---

[4] Information is available at Varsity University Online Education Programs Athletic Programs & Schools.

indoctrinated into the Varsity Defendants' culture.

82.     At these conferences, known as Varsity University events, upon information and belief, coaches, gym owners, and vendors are encouraged to drink alcohol and engage in debaucheries, and are inundated with promises of gifts and financial gain if the coaches continue to produce young member-athletes who promote the Varsity brand.

83.     At all times relevant to this complaint, and upon information and belief, the Varsity Defendants have perpetuated an atmosphere at their member gyms, as well as in camps and competitions, that encourages alcohol and drug use, and which does not adequately promote athlete safety including from emotional or physical harm and abuse.

84.     By representing a safe and superior environment, Defendants collectively sought to create a revolving door of young athletes to perpetuate the organization for years, spending tens of thousands of dollars per athlete for coaching, uniforms, camps, training, competitions, and other merchandise, until the athletes either came of age or became coaches and gym owners.

**The Varsity Defendants' Control Over the Gym Environment**

85.    At all times relevant to this complaint, and under the direction and control and/or supervision of Defendant Webb, Defendant Bain Capital, and Defendant Charlesbank, to perpetuate the business of the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, Defendants have relied upon access to child athletes who compete at Varsity-affiliated gyms, and in Varsity competitions, and who further purchase Varsity products, uniforms, and merchandise.

86.    The Varsity Defendants created Defendant USASF through a $1.8 million interest-free loan. The 2004 non-profit charter certificate lists USASF's address to be Varsity's address.

87.    At its inception, USASF was purportedly established to be the "sanctioning body" that would regulate all-star cheer by setting guidelines, policies, procedures, and processes to ensure an environment that was safe for young athletes in the All-star cheer arena.

88.    In 2006, Defendant USASF began "certifying" All-star cheer gyms with a special seal of approval, a credential that warranted the gym and its coaching staff could be trusted for cheerleader safety.

89.     Defendant USASF also credentialed coaches of certified gyms, requiring that these coaches register with USASF, and, by and through the USASF seal, certifying that the coaches were safe and green-lighting the coaches as participants in USASF-sanctioned events, camps, clinics, and competitions.

90.     As a further demonstration of its authority, in 2009, Defendant USASF created the "Professional Responsibility Code," which purportedly applied to all members and established guidelines to "maximize not only the integrity and legitimacy of the all-star industry, **but to safeguard the athletes who participate**." (Emphasis added).

91.     Yet, according to its parameters, the ethics that the USASF community strive to achieve are geared more toward discouraging members from internal poaching or solicitation than respecting the bodily integrity of young athletes. For instance, the ethical standards outlined in the Professional Responsibility Code include the following:

> i.  I pledge, as a member of the USASF, I will not initiate contact with another program's athletes and families in an effort to solicit or otherwise entice them to leave the program they

belong to and participate in my program. This practice is unethical;

ii.  I pledge, as a member of the USASF, I will not encourage any of my athletes or family members to contact another program's athletes and families during the competitive season in an effort to solicit or otherwise entice them to leave the program they belong to and participate in my program. This practice is unethical.

iii.  I pledge, as a member of the USASF, I will honor and encourage everyone to respect all mutual agreements and/or contracts made between parties, whether formal or informal, by programs, coaches and athletes….

*See* USASF Professional Responsibility Code, Version 11.0, Process.

92.    By creating a Professional Responsibility Code requiring members to pledge against internal competition, USASF essentially guaranteed that gyms would enjoy uninfringed access to athletes and their families.

93.    Defendant USASF also took over the reporting and investigation into allegations of misconduct at member gyms, and by individual members, creating

a central reporting mechanism. As such, if an athlete or their family member wished to report an incident or issue to the member gym, the athlete was directed to Defendant USASF.

94. In 2007, Defendant Webb and Varsity Spirit, LLC formed USA Cheer, which was also established to provide guidelines, policies, procedures, and processes to ensure a safe environment for young athletes in All-star cheer.

95. Defendant USA Cheer was also created with an interest-free loan from the Varsity Defendants. The director of education and programs, Jim Lord, has listed Defendant USA Cheer's address to be the same as Varsity's.

96. Defendants USASF and USA Cheer were responsible for creating and enforcing guidelines, policies, procedures, and processes for reporting coaches for misconduct and taking appropriate action for that misconduct.

97. However, Defendants USASF and USA Cheer were both operated and controlled by the Varsity Defendants.

98. The Varsity Defendants controlled Defendant USASF from inception. The Varsity Defendants submitted the original trademark application for the marks "U.S. All Star Federation" and "USASF."

99.    For at least the first 15 years of its existence, and upon information and belief, Defendant USASF's offices were located at Defendant Varsity Spirit's corporate address, a Varsity representative answered the phone for USASF, USASF employees were paid directly by Varsity, and Varsity cashed checks issued to the USASF.

100.    Defendant Varsity Spirit, LLC was listed as the owner of Defendant USASF.

101.    During the operative timeframe of this complaint, the Varsity Defendants also controlled the Board of Directors for Defendant USASF, which sets policy for USASF. The Board is composed of 13 voting members, one seat each for the seven cheer competition producers that started the USASF, the USASF Chairman, a senior USASF staff member, and four program owner members, including the Chairman of the National All Stars Connection. Two USASF board seats are permanent and are held by representatives named by the Chairman of the USASF. As Varsity has acquired more and more of Defendant USASF's founding event producers, it has continued to expand its control of the USASF Board, with as much as 75% of the seats on the Board of Directors. The seats that Varsity does not control do not have voting rights.

102.    Defendant USASF's website is located at www.usasf.net, a URL which was once openly owned by the Varsity Defendants.

103.    Upon information and belief, the Varsity Defendants eventually began concealing ownership and control of the URL behind the registration of "PERFECT PRIVACY, LLC."

104.    As with Defendant USASF, Defendant USA Cheer listed Defendant Varsity Spirit, LLC's Tennessee headquarters as its own headquarters, and Defendant USA Cheer's board included six Varsity employees.

105.    Under Defendant USA Cheer's bylaws, its thirteen-member board must include members from the following seven organizations: The Universal Cheerleaders Association, CheerSport, National Cheerleaders Association, United Spirit Association, American Cheerleaders Association, Universal Dance Association, and JAMfest.

106. Each of the seven aforementioned associations is owned by Defendant Varsity Spirit.

107.    John Patterson, a former staffer of the Nonprofit Risk Management Center who consulted on youth sports safety, said he has never heard of an arrangement quite like the one between Varsity Sprit, LLC and these non-profit

governing bodies. He said Varsity Spirit, LLC's control of USASF meant, "whatever Varsity wants, Varsity can get" in terms of rules and regulation of the cheer world.

108.   Defendant Jeff Webb, has publicly stated that teams performing at Varsity Competitions who wore a full Varsity uniform and accessories received higher scores.

109.   Upon information and belief, this structure meant that the Varsity Defendants were entirely self-regulated and were not accountable to any independent entity.

110.   In the 2010s, and amidst reports of sexual abuse against young athletes competing in a variety of sports, Congress authorized the creation of the U.S. Center for SafeSport, whose goal is to end sexual, emotional, and physical abuse on behalf of athletes.

111.   Around the same time, in 2010, in Cheer Coach & Advisor Magazine[5], Defendant USASF was officially quoted as saying, "Through credentialing, coaches are made aware of expectations as teachers and role models. It is the goal of the USASF to infuse good decisions into each and every credentialed coach so

---

[5] At the time of this particular issue, Defendant Webb served on the editorial board of Cheer Coach & Advisor.

that they may expand the positive life experience of all-star cheerleading and dance into the lives of the youth they encourage. USASF is recognized as the baseline of education for each individual coach and also expect these standards to be met."

112.   Upon information and belief, since its founding, USASF has supported the SafeSport mission, and has recognized the importance of protecting athletes from sexual, physical, and emotional abuse within the sport.

113.   At all times relevant to this complaint, athletes and their families, including Jane Doe 2 and Mary Doe, understood Defendant USASF was responsible for protecting athletes from harm. Instead, USASF has failed in its obligation to appropriately investigate reports of misconduct, to communicate internally and with law enforcement about misconduct, and has further failed to operate as intended.

114.   The Varsity Defendants, through Defendants USASF and USA Cheer, can and do enforce bans of athletes, coaches, and teams in competitions for minor rule infractions like the size of hairbows and the use of glitter. However, these Defendants have repeatedly failed to enforce suspensions or bans of coaches,

choreographers, and music producers who are known or suspected to have committed child sexual abuse.

115.   As set forth herein, Defendant Varsity Spirit, LLC, through Defendants USASF and USA Cheer, has created and is responsible for oversight and enforcement of their Professional Responsibility Codes, which in addition to discouraging competition among members, specifically acknowledges the threat of harm or abuse by coaches in cheer. For instance, according to the USASF Professional Responsibility Code, "Once a coach-Athlete relationship is established, a Power imbalance is presumed to exist throughout the coach-Athlete relationship (regardless of age) and is presumed to continue for Minor Athletes after the coach-Athlete relationship terminates until the Athlete reaches 20 years of age."

116.   According to its own literature, the Professional Responsibility Code is applicable to "all members," referring to Varsity-affiliated gyms.

117.   At the same time that Defendant USASF and Defendant USA Cheer, and even the Varsity Defendants, publicly supported the mission of SafeSport, the Varsity Defendants were simultaneously lobbying against the inclusion of cheer as a sport.

118.   The Varsity Defendants' effort to preclude cheer from being considered a sport is directly in line with Defendant Varsity Spirit's business model. If cheer were considered a sport, it would necessarily increase athlete oversight and regulation, and would diminish the times, methods, and places that the athletes would be allowed to compete.

119.   From 2014 to 2018, Defendant Charlesbank wholly owned the Varsity Defendants and thus owned Defendants USA Cheer and USASF and provided capital to the Varsity Defendants and Defendants USA Cheer and USASF for the purpose of building the network of Varsity-affiliated private gyms and coaches throughout the United States.

120.   During this same timeframe, Defendant Charlesbank, as well as the Varsity Defendants, reaped massive financial benefits associated with the growing network of families who came into Varsity-affiliated gyms, and who believed the Varsity Defendants' representations that they were providing safe and protective environments for families.

121.   In 2018, Defendant Bain Capital purchased the Varsity Defendants from Charlesbank for roughly $2.8 billion. At the time of the sale, Defendant

Charlesbank made a new investment in Varsity alongside Defendant Bain and retained a minority stake in the business.

122.    Related to its purchase, Defendant Bain Capital stated: "This new partnership presents Varsity Brands with an exciting opportunity to continue to expand and improve our products and services while remaining steadfast to our commitment to improving student life and overall engagement…. Bain Capital's extensive consumer and technology experience and their commitment to our mission of empowering young people will help us accelerate our growth to a new level."[6]

123.    In addition, Defendant Bain represented: "For over 50 years, Varsity Brands has served as an essential force for good as part of the academic and athletic student experience…We are excited to partner with the company's experienced, committed management team to amplify the company's ecommerce operations and digital expansion, while accelerating its growth through

---

[6] *See* "Varsity Brand, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity," June 19, 2018, available at: Varsity Brands, the Leader in Elevating Student Experiences in Sports, Spirit, and Achievement, to be Acquired by Bain Capital Private Equity | Bain Capital.

complementary acquisitions and organic initiatives to become the go-to source for every school's sport, spirit and achievement needs."[7]

124.   Upon information and belief, Defendant Bain's accelerated growth model for the Varsity Defendants depended upon access to an ever-expanding network of young athletes who would not only purchase Varsity branded merchandise, but would also continue to attend Varsity events. In that regard, during the operative timeframe, the Varsity Defendants issued annual invoices to members, including coaches, gyms, and athletes, payment of which was mandatory and ultimately profited Defendant Bain and its minority partner Defendant Charlesbank.

125.   Meanwhile, at the time of Defendant Bain's acquisition, the Varsity Defendants were embroiled in very public litigation arising out of the Varsity Defendants' alleged anti-competitive tactics in acquiring gyms and curbing other event-companies.

126.   In 2020, former Varsity-member coach and "Cheerlebrity" Jerry Harris, star of the Netflix series "Cheer," was accused of soliciting sex from two children during the 2019 Varsity-competition season. Harris plead guilty in

---

[7] *Id.*

February, 2022, and was sentenced in July, 2022 on two counts, one of which included traveling across state lines with the intent of soliciting sex from a minor. This travel occurred in conjunction with a cheer competition.

127.   After the Bain acquisition, on December 7, 2020, Defendants USASF and USA Cheer announced a universal system for reporting athlete safety concerns, as well as a central repository listing ineligible coaches and individuals. Defendants USASF and USA Cheer stated that these measures "will provide a robust athlete safety infrastructure readily available across the entire cheer community."

128.   This list, the "Unified Ineligibility List," is accessible online, lists the nature of the infraction, occasionally provides public documentation, and names the offender.

129.   As of the date of filing, this list included roughly 230 names and entities, including Defendant Erick Kristianson. Upon information and belief, the vast majority of the suspensions, both temporary and permanent, are related to claims of sexual misconduct between minors and their coaches, choreographers, and other adults. Some of the alleged misconduct dates back more than ten years.

130. Far from providing security for athletes, the list is replete with temporary suspensions where the only information provided is "Member policy violated related to athlete protection," with no records or other documentation.

131. In addition, the list does not provide the status of the investigation, and, upon information and belief, is not updated on a regular basis.

132. For instance, as it relates to Defendant Kristianson, and despite public reporting and news articles related to the allegations of sexual misconduct against him, Defendant USASF's website lists him only as temporarily suspended, and provides that this suspension is based on "[m]ember policy violation related to athlete protection."

133. Any USASF member who is suspended has the right to appeal the decision. Yet, and upon information and belief, the affected athletes never receive notice that the suspended coach has invoked their appellate rights, nor are the athletes otherwise involved in this appellate process or decision.

134. Defendant USASF admits on its own website that it does not include all decisions, but rather "only those that could pose a potential risk to the broader sport community." Whether an offense rises to the level of posing a potential risk to the broader sport community is left entirely to the discretion of USASF.

135.    The majority of instances of misconduct included on the USASF list arise out of sexual harm or misconduct. This repeated misconduct gave notice to all Defendants that a broader issue existed within the Varsity Defendants' cheer community.

136.    Yet, other than the list, and upon information and belief, the Varsity Defendants made few if any modifications to the internal screening process for coaches, and made no modifications to the gym and competition environment.

137.    Upon information and belief, during the interim of the allegations set forth above, the Varsity Defendants, in conjunction with Defendant USASF and Defendant USA Cheer, have hosted multiple competitive events throughout the United States, during which time affiliated teams from across the country converge at a pre-selected location using hotels, premises, and businesses hand-selected by the Varsity Defendants.

138.    Upon information and belief, during these events, underage student-athletes comingle with other teams, coaches, choreographers, and authorized Varsity vendors either without chaperones or minimally chaperoned, and are exposed to environments where drugs and alcohol were readily available, and where the student athletes were subject to rampant solicitation and inappropriate

sexual conduct and innuendoes, including by coaches such as Jerry Harris, and Scott Foster.

139.   At the same time, individual gyms and coaches would receive substantial benefits from affiliation with the Varsity Defendants, including the reputational benefits of being affiliated with Defendant USASF, Defendant USA Cheer, the Varsity Defendants' brands, and monetary benefits directly linked to the number of competitions in which a gym participated as well as the number of athletes the gym brought to the competition.

140.   Moreover, the individual gyms serve as platforms selling additional Varsity branded merchandise, such as sweatshirts, tops, hats, and jewelry.

141.   To perpetuate the popularity of certain gyms and coaches, the Varsity Defendants utilized social media, often liking posts and messages by specific athletes and coaches, such as Defendant Champion Elite, and Defendant Kristianson, and providing these same athletes and coaches with promotional codes to pass on to minor athletes to sell the Varsity Defendants' goods and services.

142.   In this way, the Varsity Defendants and the gyms and coaches had a symbiotic relationship, where the gyms and coaches supplied the Varsity

Defendants with hundreds of millions of dollars of revenue from under-age athletes, and the coaches and gyms used the Varsity Defendants' reputation to bolster their own reputation with minor athletes.

143.   Upon information and belief, the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital relied upon the gyms and coaches to create a replenishing group of underage athletes, and future coaches, and gym owners, to provide a guaranteed stream of revenue.

144.   As such, and upon information and belief, it was contrary to the Varsity Defendants' business model for Defendants USASF and USA Cheer to ban coaches and gyms from their system, as every coach and gym represented a pipeline of current and future revenue for the Varsity Defendants.

145.   Rather, when allegations about a specific coach or Varsity affiliate were made, the Varsity Defendants, Defendant USASF, and Defendant USA Cheer either ignored the allegations, determined the allegations were not "credible" based upon arbitrary criteria, or allowed the would-be abuser to quietly exit the Varsity-affiliated program, with the result that the accused could relocate to a new gym or facility without parents knowing about the allegations of misconduct.

146.    At all times relevant to this complaint, and upon information and belief, Defendants Bain Capital and Defendant Charlesbank knew or should have known that the Varsity Defendants, Defendant USASF, and Defendant USA Cheer were not appropriately enforcing policies, processes, and procedures related to athlete safety, and that the Varsity Defendants were hosting events without regard for, and in contravention to the safety of child athletes.

147.    Moreover, and upon information and belief, to incentivize coaches and gyms, Defendants Bain Capital, and Charles Bank authorized, and the Varsity Defendants offered, significant monetary benefits to increase sales of Varsity goods, and participation in Varsity events, including by providing cash rebates and promotional codes, as well as in creating event environments that comingled child-athletes with adult coaches, gym owners, and choreographers.    In these environments, it was reasonably foreseeable that the athletes would be minimally supervised, and that the athletes would be exposed to drugs and alcohol.

148.    Upon information and belief, this environment fostered and contributed to the sexual, mental, and physical abuse inflicted upon the athletes.

149.    Upon information and belief, this competition environment was the brainchild of Defendant Jeff Webb, who used the competitions as a mechanism for his companies to establish dominance in the cheer market.

150.    During the timeframe relevant to this complaint, Plaintiff is informed and believes that employees of the Varsity Defendants resigned their positions because of the abuse and systemic failures they saw within the system, including failures to uniformly apply policies and procedures related to athlete safety, rampant drug use within the leadership of the Varsity Defendants, as well as alcohol and drug use by athletes during competitions, and general favoritism and promotion of teams that chose to endorse or affiliate with the Varsity Defendants, disadvantaging independent teams.

151.    Defendant Webb was previously Varsity's president but resigned in 2020 amid the Jerry Harris sex abuse scandal.

152.    During the operative timeframe of this complaint, Defendant USASF received numerous reports and allegations against coaches, choreographers, videographers, and music directors. Upon information and belief, the general response from Defendant USASF was to disregard these reports and accusations

42

as attempts by disgruntled athletes and parents to get coaches and gyms in trouble if the athletes did not receive coveted team positions.

153.    A 2020 investigative series by journalists Marisa Kwiatkowski and Tricia L. Nadolny for USA Today revealed scores of repeat sex offenders active within USASF certified gyms and preferred vendor lists.[8] Some of the cases of which Defendants Bain Capital, Charlesbank, and the Varsity Defendants had or should have had knowledge include:

a.   A Virginia gym owner was convicted of sexual battery and assault and placed on the sex offender registry after three girls he coached at his Virginia gym came forward. As of 2020, this coach was still listed as the gym's owner and was still USASF certified. Varsity continued to invite his gym to competitions. One of his victims had to stop cheering competitively because her convicted abuser was allowed to stay involved around children and in proximity to her.

b.   A Charlotte, North Carolina coach who was arrested for two counts of sexual assault of a minor and lost his middle school teaching job

---

[8]    https://www.usatoday.com/in-depth/news/investigations/2020/09/18/cheerleading-cheer-investigation-sexual-misconduct-sex-offender-banned-list/3377622001/

https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

continued to have access to minors afterward. Though the gym's owners claimed he was told he was no longer welcome to work with the gym's athletes after his arrest, he continued to appear in official social media accounts of the gym, was connected by the gym director to parents for private lessons, and attended a Varsity event in Florida where he was photographed posing next to the gym's athletes in a gym uniform with the word "Coach" on his shorts.

c.  A coach who had been fired from a gym and charged with child pornography was discovered to still be working in the cheer industry by the gym owner who had originally fired him. The gym owner called Varsity, who told her his background check was fine. After she went to the courthouse to get the records of his conviction and sent them to Varsity, months passed and the man continued coaching children at Varsity events through USASF gyms.

d.  A Washington gym owner was not banned by USASF until more than a year after the organization received reports in 2018 that he had been accused of sexual misconduct with minors.

154.   Moreover, and upon information and belief, during the operative timeframe, Defendant USASF refused or failed to report non-member coaches and adults accused of misconduct to law enforcement – contravening its representation that USASF and its members are mandatory reporters. (*see* USASF Terms and Conditions of Coach Membership);

155.   Upon information and belief, Defendant USASF has received hundreds of complaints against coaches, choreographers, videographers, and others accused of sexual misconduct.

156.   Until recently, however, Defendant USASF failed to dedicate fulltime staff to managing investigation of these complaints.

157.   Ginger Wilczak, the part-time contract employee USASF eventually hired to field reports of misconduct, stated that she worked 10 hours per week at most.[9] In an interview with Mary Carillo in an HBO Real Sports investigative segment, she reported that she had been actively prevented from taking the necessary actions to perform the job function for which she was purportedly hired.

---

[9] . https://usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

158.   Defendant USASF has been excruciatingly slow to develop policies and procedures for keeping athletes safe from sexual abuse in an industry rife with it.

159.   Meanwhile, according to its website: "USASF is the U.S. All Star Federation. It's about safety standards. It's about coaches' education. It's about providing a safe environment to allow for the continued growth of all-star cheerleading and dance across the country. ***It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care***. It's about standardization of rules from one competition to the next. It's about time." (Emphasis added).

160.   In the years since this public representation, however, Defendant USASF's gym and coach training has focused almost exclusively on avoiding physical injury to the athletes.

161.   In fact, Defendant USASF's "Athletic Performance Standards" dealt only with things like hair accessories, makeup, uniforms, choreography, and music. The general message is that Defendant USASF concerns itself more with how its athletes look than how its coaches behave.

162.   In 2012, Defendant USASF reiterated its "image and appearance policy" to address "the increasing criticism about the general appearance of our athletes during competition and the unflattering media stories that have focused on how our sport is presenting its athletes, particularly those in the younger age groups."

163.   At the same time, Defendant USASF began offering, but not requiring, a $1 million sexual abuse/sexual molestation policy to gym owners through K&K Insurance.

164.   It took until 2015 for Defendant USASF to implement background checks on certified coaches and gym owners. However, Defendant USASF failed to uniformly apply the process.

165.   Defendant USASF also created the "Triple A" challenge as part of its response to the SafeSport Act that became law in 2018, but in so doing, effectively shifted responsibility for reporting abuse and exploitation from the corporate entities empowered to oversee the sport onto minors and their families telling athletes they should ask when posting photos to social media: "Is it Athletic? Is it Age Appropriate? What does it Amplify?" The Varsity Defendants asked for

"thoughtful" social media posts to be hash-tagged with "#ThisIsAllStar and "#usasfATHLETES1st" as part of their safety plan.

166.    Meanwhile, Defendant USASF failed to follow its own procedures with respect to rampant reports of child sexual abuse, allowing complaints to stall or delaying action when their policies clearly call for an adult member to be suspended or banned.

167.    Jim Lord, Defendant USA Cheer's director of education and programs, said in 2020 that the organization's banned list is one of the tools they use to keep athletes safe. The manner in which this oversight was performed, according to Lord, was that he had it on his "weekly checklist" to visit search engines and use terms like "cheer coach", "athlete abuse", and "sexual assault" to find people to ban[10]. Between June and September that year, Lord had identified five (5) names. Investigative reporters with USA Today managed to find 180 people during that same time frame. More than 140 of those had been convicted of a child sex crime and more than half of those were registered sex offenders.

---

[10] It is telling of the problem that Lord used words related to sexual abuse when looking for coaches, gym owners, and affiliates who violated USASF policy. This very specific search criteria demonstrates that USASF understood the risks of harm inherent to the sport.

168.   Also in 2020, W. Scott Lewis, partner at legal and risk management firm TNG, criticized Defendant USASF's handling of reports and complaints in that they often sat on their hands and did nothing, assuming law enforcement had been contacted by someone else. He said it was not typical for organizations to wait for law enforcement action before taking their own action unless they've explicitly been asked to do so. He said, "You don't want to be on the sideline saying, 'Well, we can't do anything because law enforcement's doing it,'" Lewis said. "You want them to have the ability to engage in interim measures or your own investigation, or both." In May of 2021, Defendant USASF hired TNG to consult on its athlete safety practices.

169.   Well after the very public arrest of Jerry Harris, Defendants USASF and USA Cheer finally began offering risk and safety training to member gyms and personnel.

170.   However, instead of mandating this risk and safety training for all members, and providing training free of charge, the Varsity Defendants require members to pay an additional fee to access Defendant USASF and Defendant USA Cheer's safety training.

171.    Defendant USASF also began "requiring" that all member programs "have clear, written guidelines that prohibit adults who have contact with minors from engaging in conduct that is either inappropriate and/or illegal."

172.    Defendant USASF failed however, to provide oversight on reviewing or approving those policies, or even verifying that gyms had, in fact, enacted guidelines.

173.    Defendant USASF has stated that it does not have the ability to enforce its policies and procedures, referring to these as "recommendations" rather than requirements.[11]

174.    Around this same timeframe, Defendant USASF created an online reporting mechanism for receiving complaints. Experts have raised concerns over the burden of this reporting process. When printed, the required forms are over 15 pages long.

175.    Moreover, the reporter must cite to the alleged rule or regulation their attacker violated, referring to a slew of different sources.  By so doing, Defendant

---

[11] *See* "Varsity Brands Owns Cheerleading and Fights to Keep it From Becoming an Official Sport," Leif Regstad, Houston Press (Jul. 21, 2015) available at: https://www.houstonpress.com/news/varsity-brands-owns-cheerleading-and-fights-to-keep-it-from-becoming-an-official-sport-7606297.

USASF shifted its mandatory duty to report child abuse to the victim and their family.

176.    In addition, the cumbersome nature of the reporting process, coupled with the fear many feel coming forward against coaches and gym owners who would not immediately be ousted, effectively chilled reporting.

177.    Kelli Hughes, the director of the Center for Child Policy, found Defendant USASF's reporting process to be unnecessarily complicated and burdensome.

178.    For the 2021 USASF Worlds at Disney World in Florida held in May of 2021, the organization sent out an information packet which contained athlete conduct rules but did not address coach conduct. The policy mandated one (1) adult chaperone, defined as anyone 21 of years of age or older, for every nine (9) child athletes.

179.    Webinars on athlete safety listed at the site in November 2021 included topics like "tumbling drills", "coed stunting", "building transitions", "choreography", "twisting skills theory", and "flyer stability and flexibility". Conspicuously absent at this crucial time was any training on preventing or reporting child sexual abuse or molestation.

180.    In short, Defendant Bain Capital, Defendant Charlesbank, the Varsity Defendants, and Defendants USASF and USA Cheer, have created an elaborate illusion of a safe system in order to draw more members in so they could sell more merchandise and collect more fees for events and camps, knowing their young vulnerable members were at risk and that they were doing nothing about removing the criminal coaches, affiliates, gym owners, and administrators creating that risk.

## CHAMPION ELITE LEGACY, LLC

181.    As stated herein, at all times relevant to this complaint, Defendant Champion Elite was a private cheer, dance, and tumbling gym offering its services to children as well as adults in Florida.

182.    Throughout the relevant timeframe, Defendant Champion Elite was owned by and operated by Defendant Ashley Hughes.

183.    Upon information and belief, Defendant Champion Elite was a highly awarded and profitable program within the Varsity Defendants' community.

184.    At all times relevant to this complaint, Defendant Champion Elite was certified by Defendant USASF as meeting All-star standards with respect to coach credentials, program quality, and athlete safety.

185.    As such, at all times relevant to this complaint, the Varsity Defendants warranted to athletes and families that Defendant Champion Elite and its owners and coaches, employees, and adult athletes, including Defendant Kristianson could be trusted with minor children.

186.    At all times relevant to this complaint, Defendant Kristianson was an employee of Defendant Champion Elite, working on behalf of Defendant Champion Elite and in the course and scope of his employment.

187.    As a condition of employing Defendant Kristianson, and upon information and belief, Defendant Champion Elite required Defendant Kristianson to become a coaching member of Defendant USASF.

188.    Moreover, at all times relevant to this complaint, Defendant Champion Elite represented that Defendant Kristianson was a credentialed member of USASF, adhering to Defendant USASF's policies and procedures protecting minors, including Jane Doe 2, from physical, sexual, and mental abuse.

189.    At all times relevant to this complaint, and upon information and belief, Defendant Champion Elite authorized, allowed, and represented that Defendant Kristianson was qualified to serve as a coach and mentor for minor

athletes, including Plaintiff Jane Doe, and so gave Defendant Kristianson wide access to said minor.

190.    Moreover, at all times relevant to this complaint, and upon information and belief, Defendant Champion Elite represented that Defendant Kristianson was credentialed and therefore a member of Defendant USASF's authorized All-star community.

191.    In addition, and at all times relevant to this complaint, Defendant USASF and the Varsity Defendants knew, or had reason to know that Defendant Kristianson was in contact with minor athletes, such as Plaintiff Jane Doe 2.

192.    During the operative timeframe of this complaint, Defendant Kristianson was a coach, mentor, and authorized representative of Defendants Champion Elite, USASF, and the Varsity Defendants, responsible for training and interacting with minor children, including Plaintiff Jane Doe 2.

193.    At all times relevant to this complaint, Defendants Champion Elite, USASF, and the Varsity Defendants put Defendant Kristianson in a position of particular trust, and represented to the cheer community, including Plaintiff Jane Doe 2 that Kristianson was safe to provide coaching services to minor athletes.

194.   Yet, at all times relevant to this complaint, Defendant Kristianson posed a danger to minor athletes including Plaintiff Jane Doe 2, including a danger from sexual harassment, exploitation, and abuse. Moreover, and as set forth more fully herein, other members of Defendant Champion Elite's organization knew or had reason to know of the abuse perpetrated upon Plaintiff Jane Doe 2 by Defendant Kristianson, yet did nothing.

195.   At all times relevant to this complaint, Defendant Champion Elite remained in lock step with the Varsity Defendants, competing at the Varsity Defendants' events, purchasing the Varsity Defendants' merchandise, participating in the Varsity University training conferences, and mandating that Defendant Champion Elite's athletes become members of Defendant USASF, including paying USASF annual dues.

196.   Even today, Defendant USASF has only temporarily suspended Defendant Kristianson, and no action seems to have been taken against Defendant Champion Elite or Defendant Hughes.

197.   Meanwhile, the Varsity Defendants, Defendant USASF, Defendant USA Cheer, and, by virtue of their acquisition, ownership, and control, Defendant

Bain Capital knew or should have known of the abuse being perpetrated by their credentialed coaches, such as Defendant Kristianson.

## The Enterprise

198.   Plaintiff realleges the preceding paragraphs as though repeated verbatim herein.

199.   The unlawful acts alleged against the Varsity Defendants, Defendant USASF, and Defendant USA Cheer, as well as against Defendant Charlesbank and Defendant Bain Capital in this Complaint were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

200.   The unlawful acts alleged against Defendant Champion Elite and Defendant Kristianson who coached, choreographed, and perpetrated abuse upon minor athletes were authorized, ordered, or performed by their officers, agents, employees, representatives, or shareholders while actively engaged in the management, direction or control of their own business or affairs and those of other Defendants.

201.   Defendants' officers, agents, employees, representatives, or shareholders operated under the explicit and apparent authority of their principals.

202.   Each Defendant, and any respective subsidiaries, affiliates and agents operated as a single unified entity with the common goal of taking billions of dollars from minor athletes who wanted to be a part of the competitive cheer world Defendants oversee, as well as to perpetuate a pipeline of new child-athletes, coaches and gyms. Defendants' Enterprise functioned as a continuing unit throughout the conspiracy and continues its operation through the filing of this Complaint.

203.   At all times relevant to the complaint, Defendants possessed and continue to possess an ongoing organizational structure with sufficient continuity related to the Enterprise.

204.   Each Defendant participated in the operation and management of the Enterprise.

205.   The Enterprise is separate and distinct from the pattern of racketeering activity as set forth below.

206.    Whenever in this Complaint reference is made to any act, deed, or transaction of any organization, the allegation means that the Defendants and each of them engaged in the act, deed, or transaction by or through their officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the organization's business or affairs.

207.    Individuals alleged to have engaged in misconduct in violation of the laws pleaded herein are alleged to have done so on behalf of all members of the enterprise between the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, Defendant Bain Capital, and Defendant Champion Elite. The athletes who paid to enter the competition cheer world did not know or did not distinguish between the corporate affiliations of different individuals. These organizations all affirmatively and collectively represent themselves as one all-star family, rather than separate parents and subsidiaries.

208.    Defendants' unlawful conduct as alleged herein has taken place in and affected the continuous flow of interstate commerce in the United States through the certification of private gyms and their coaches, as well as the

organizing, promoting, and managing cheer competitions throughout the United States.

209.    The conduct alleged herein is tied to billions of dollars of interstate commerce, with the Varsity Defendants, their governing bodies, and their parents controlling at least 80% of the competitive cheer market through membership fees, gym and coaching fees, competition fees, insurance, apparel, and travel for training and competition events all over the United States and the world.

210.    During its ownership period from 2014-2018, Defendant Charlesbank conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the competitive cheer world with the promise of a safe and superior coaching experience by joining a certified gym. Defendant Charlesbank has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so. When it sold to Defendant Bain Capital in 2018, rather than walk away from the Enterprise, Defendant Charlesbank made the conscious business decision to reinvest and retain an ownership interest in the Varsity Defendants to continue reaping the financial benefits of Varsity's Enterprise with Defendants Champion Elite and Kristianson.

211. Once ownership transferred to Defendant Bain Capital in 2018, Defendant Bain Capital conspired with the Varsity Defendants, Defendant USASF, and Defendant USA Cheer to solicit young athletes throughout the United States into the Varsity universe of competitive cheer with the promise of a safe and superior coaching experience by USASF and USA Cheer certified gyms, coaches, and instructors.

212. Defendant Bain Capital has provided funding to market these programs for the Varsity Defendants and obtained financial rewards from having done so through Varsity, USASF, and USA Cheer's business Enterprise with Defendant Champion Elite and continues to do so as set forth herein.

213. All Defendants were co-conspirators in a scheme to get as many families as possible to entrust their child athletes to these private gyms and coaches in order to generate massive revenue from these athletes, all while Defendants were:

(a) failing to properly vet the coaches by investigating backgrounds;

(b) failing to provide sufficient oversight and monitoring of the member gyms;

(b) failing to properly investigate complaints of inappropriate and criminal sexual conduct by the coaches against minors;

(c) failing to report complaints of inappropriate and criminal sexual conduct against minors;[12]

(d) failing to enforce rules and regulations for chaperoning and supervision of minors;[13]

(e) failing to enforce ineligibility due to complaints regarding athlete safety;[14]

(f) facilitating the transfer of minor athletes across state lines for the purpose of or with a reckless disregard for whether the athletes would be subjected to sexual and/or physical abuse;[15]

---

[12] (*see* USASF Terms and Conditions of Coach Membership);

[13] *See* "Sex Offender allegedly skirted ban to continue coaching cheerleaders," Jesse O'Neil, January 11, 2021, NYPost, available at: https://nypost.com/2021/01/11/sex-offender-allegedly-skirted-ban-to-continue-coaching-cheerleaders/; *see also* "Accused Cheer Monopolist Varsity Squares Off Against Ex-Employees," Daniel Libit, Sportico (Oct. 13, 2021) (Commenting before the Federal Trade Commission during an open meeting, David Owens, the director of events for the Open Championship Series told regulators Varsity's hold over USASF and USA Cheer presented "an immediate threat to the health, well-being, and safety of the children and the sport"), available at: https://www.sportico.com/leagues/other-sports/2021/accused-monopolist-varsity-spirit-1234643664/.

[14] *See* "Cheerleading's Ban List Skips 74 Sex Offenders," Marisa Kwiatkowski & Tricia L. Nadolny, Sep. 22, 2020 USAToday.

[15] *See United States v. Jeremiah Harris*, C/A No. 20-CR-637, Plea Agreement available at: https://www.justice.gov/d9/press-releases/attachments/2022/02/10/harris_plea_agreement_0.pdf

(g) facilitating the transfer of minor athletes across state lines for the purpose of or with a reckless disregard for whether the minors would be served drugs and alcohol by other affiliated adults;

(h) gathering at predetermined locations to discuss and exchange notes and information related to the Enterprise including how to lure additional minor athletes and how to maximize profits;

(i) sending and collecting bills and invoices across the mails and wires despite the fraud perpetrated by Defendants;

(j) using Defendant Champion Elite's platform to obtain access to significant financial resources of Plaintiff and other member-athletes, both for annual invoices and fees, as well as for merchandise, both mandatory and otherwise;

(k) disseminating fraudulent misrepresentations through mail and wire as to the safety Defendants guaranteed through a sham certification process;

(l) collecting money from minor athletes related to the above referenced scheme;

(m) requiring memberships of all minor athletes competing on behalf of member gyms, which, in part, allowed Defendants to track and monitor the

number of minor athletes under their care;

(n) creating "stay-to-play" whereby Defendants mandated member gyms bring their minor athletes across state lines to competitions and stay at pre-selected hotels allowing Defendants to track these athletes and exercise control over athletes' physical locations;

(o) disseminating fraudulent misrepresentations about Defendants' gym and coach certification process through the mails and wires so as to perpetuate the image of a safe environment for minor athletes;

(p) promoting certain coaches and athletes on social media who Defendants knew or should have known had engaged in illicit, predatory behavior and sexual misconduct with minors, all while authorizing these same individuals to sell goods for Defendants on Defendants' platforms, or with Defendants' endorsements;

(q) mandating annual membership in Defendant USASF by athletes, member coaches, and clubs creating a conflict wherein the USASF received monetary benefits from certified coaches who USASF was also obligated to investigate for misconduct;

(r) prohibiting athletes from transferring out of certain gyms so as to chill

reporting and control competition;

(s) chilling athletes from coming forward with allegations by promising that athletes who stayed in the system might achieve additional goals including collegiate opportunities;

(t) creating marketing materials and personas specifically intended to target and attract young children to the sport, including by using certain color schemes, wording, and imagery (*e.g.* Varsity AllStar Instagram page, Varsity Spirit Instagram Page);

(u) failing to employ reasonable policies, procedures, guidelines and safeguards consistent with the purported "standard of care" Defendants have represented in their materials;[16]

(v) failing to properly staff, fund, resource, train, and otherwise enable the implementation of the instruments by which Defendants promised to police and govern the sport;[17] and

---

[16] *See* September 18, 2020 article in the USA Today, and commenting on the arrangement between Defendants USASF and Varsity Spirit. In the article, former Risk Management Center staffer John Patterson says that "Whatever Varsity wants, Varsity gets [from USASF]."

[17] *See* Commentary from Ginger Wilczak, former USASF Safesport Manager and part-time contract employee on the perpetual understaffing and lack of resources in USASF's office tasked with investigating reports of misconduct, "A huge slap in the face': Frustrations Grow Over Cheerleading's mishandled sexual misconduct cases," Tricia L. Nadolny, Marisa Kwiatkowski, USA Today (Dec. 23, 2020), available at: https://www.usatoday.com/in-depth/news/2020/12/23/cheerleading-cheer-sexual-misconduct-complaints-usasf/6484248002/

(w) interfering by the Varsity Defendants with the safety and regulatory operations of Defendants USA Cheer and USASF;[18]

**THE ABUSE**

214.     Plaintiff Jane Doe 2 began cheering in or around 2019 when she was 10 years old.

215.     Plaintiff Jane Doe 2 began cheering at Champion Elite Legacy, LLC , an all-star cheer and tumbling gym in South Daytona Beach, Florida.

216.     At all times relevant to this complaint, Plaintiff Jane Doe 2 was a member of USASF and paid her dues annually.

217.     Defendant Champion Elite Legacy, LLC was owned by Dr. Ashley Hughes, a chiropractor, and managed by Erick Kristianson, a 43-year-old man who also coached cheer at the gym.

218.     Mary Doe and Plaintiff Jane Doe 2 met Defendant Erick Kristianson in or around 2019 when he joined the coaching staff at Champion Elite.

---

[18] *See* "Cheerleading Antitrust suit spurs brawl over ex exec's documents," Daniel Libit, Sportico (Jan. 12, 2022) (available at: https://www.sportico.com/law/news/2022/varsity-spirits-antitrust-accusers-1234658119/).   In the article, ex-Varsity executive Marlene Cota bluntly states her impression that Varsity placed its brand over the safety of athletes. Cota was also featured in an episode of HBO's Real Sports.

219.     Over the next several months, Defendant Erick Kristianson introduced his mother to Mary Doe, Plaintiff Jane Doe 2 and their family and shared details about his religious upbringing out of state.

220.     Knowing that Mary Doe, her husband and children described themselves as a faith-based family, Defendant Erick Kristianson took great care to emphasize his lifelong connections to religious organizations and his religious upbringing. This commonality helped Defendant Kristianson form a swift and meaningful bond with Mary Doe, Plaintiff Jane Doe 2 and their family.

221.     Beginning in or around 2020, Mary Doe and her family began to see Defendant Erick Kristianson in social settings outside of the gym. Over time, Mary Doe and her family, including her minor daughter, Plaintiff Jane Doe 2, grew to love and trust Defendant Kristianson, welcoming him as part of their family.

222.     Mary Doe noticed that other parents at the gym trusted and cared for Defendant Erick Kristianson. Several of the families relied on Defendant Erick Kristianson to transport their children to and from cheer, and several of the families also included him in their social gatherings and events. Mary Doe and her family, including Plaintiff Jane Doe 2 , grew to love and trust Defendant Erick Kristianson.

223.     Defendant Erick Kristianson would often transport Plaintiff Jane Doe 2 and her sister to and from cheer practices and other cheer competition events.

224.     Defendant Erick Kristianson accompanied Mary Doe, her husband, and children (including Plaintiff Jane Doe 2) on several weekend trips, including trips to Tampa, Universal Studios, and Busch Gardens. By all accounts, Defendant Erick Kristianson became like family to Mary Doe, her husband and children.

225.      In or around 2022, Defendant Erick Kristianson notified Mary Doe that he needed a place to stay. Mary Doe offered for Defendant Erick Kristianson to temporarily move in to a detached apartment on her property.

226.     During this time, Defendant Kristianson continued to transport Jane Doe 2 and her sister to cheer practices and continued to accompany the family on trips and to events. In or around March of 2022, Mary Doe allowed Plaintiff Jane Doe 2 and her sister to travel with Defendant Erick Kristianson to the home of another cheer coach in South Carolina.

227.     In or around early 2022, Defendant Erick Kristianson played a "game" with Plaintiff Jane Doe 2 that he called, "Jeepers Creepers," where he would discuss sexual content, grope and fondle Plaintiff Jane Doe 2. Defendant Erick Kristianson would initiate this "Jeepers Creepers" "game" in the car while Plaintiff

Jane Doe 2 was riding in the front seat. (Defendant Erick Kristianson would insist that Plaintiff Jane Doe 2 ride with him in the front seat as opposed to the back seat of the vehicle). During this "game" Defendant Erick Kristianson would run his hands up Plaintiff's leg and thighs and place his fingers and hands on her vagina. Plaintiff Jane Doe 2 was 13 years old at the time.

228.    Defendant Erick Kristianson kept a vibrator in the front seat of his vehicle that he would point out and discuss with Plaintiff Jane Doe 2 and other minor children. The existence and purpose of the vibrator was known to Plaintiff Jane Doe 2 and others.

229.    Defendant Erick Kristianson exposed his penis to Plaintiff Jane Doe 2 on numerous occasions both in and outside of the gym.

230.    Defendant Erick Kristianson once entered Mary Doe's home while he knew Plaintiff Jane Doe 2 was home alone and fondled Plaintiff Jane Doe 2's breasts.

231.    In or around late 2021 – early 2022, Defendant Erick Kristianson took Plaintiff Jane Doe 2, her sister, and other minors to a hot tub at a local resort. While in the hot tub, Defendant Erick Kristianson began to rub Plaintiff Jane Doe 2's leg. Plaintiff Jane Doe 2 told Defendant Erick Kristianson to stop, but he refused and

instead escalated the assault, moving his hands to her vaginal area. Defendant

Kristianson continued to grope Plaintiff Jane Doe 2's private area until she stood

up and told one of her friends that she was ready to leave. Defendant Kristianson

overheard Jane Doe 2's comments and berated her, claiming that they had just

arrived and leaving so soon would have rendered the entire trip a waste of time.

232.    In or around April of 2022, while at the EOC cheer competition in

Orlando, Florida, Plaintiff Jane Doe 2, who has no history of seizures or a seizure

disorder, experienced unexplained seizures and was transported three times by

ambulance to a local hospital for evaluation and treatment. She was hospitalized

for three days.

233.    In the summer of 2022, Mary Doe learned of Defendant Erick

Kristianson's sexual abuse of her other daughter, including a video call wherein

Defendant Erick Kristianson exposed his erect penis to two minors. Mary Doe

reported this incident, along with the abuse of Plaintiff Jane Doe 2 to local law

enforcement.

234.    After learning of Defendant Erick Kristianson's inappropriate sexual

behavior towards Plaintiff Jane Doe 2 and others, Mary Doe became aware that

there were complaints made by other parents at Champion Elite about Defendant

Kristiansen going to practice with short shorts and no undergarments, exposing his penis to the children.

235.    Upon information and belief, a former co-owner of Defendant Champion Elite Legacy, LLC left the gym in part over Ashley Hughes' inaction and mishandling of complaints about Defendant Kristianson's inappropriate sexual behavior with athletes.

236.    On or about July 12, 2022, a warrant was issued for the arrest of Defendant Kristianson for the felonies of Lewd and Lascivious Exhibition to a victim under the age of sixteen, Lewd and Lascivious Molestation of a person under the age of sixteen, Lewd and Lascivious Exhibition via Computer to a person under the age of eighteen, and Lewd and Lascivious Molestation of a person between the ages of 12-16.

237.    Defendant Kristianson was arrested in Kansas on August 4, 2022. He was extradited to Florida and arraigned on the charges. Bond was set at $300,000 surety. Defendant Kristianson posted bond and was released on August 5, 2022.

238.    As of the date of this filing, the criminal cases against Defendant Kristianson are pending in the Volusia County Circuit Court.

239.     Upon information and belief, another parent at the gym instructed Defendant Ashley Hughes to keep Defendant Erick Kristianson away from her child.

240.     Upon information and belief, Defendant Ashley Hughes addressed these complaints with Defendant Kristianson by instructing him to wear proper undergarments during practices, but did not take any further action to confirm compliance or deter the behavior.

241.     Upon information and belief, reports of Defendant Kristianson exposing his penis to underaged athletes were made to Florida Department of Children and Families and Defendant USASF in October of 2021 and February of 2022, but no action was taken.

242.     Plaintiff Jane Doe 2 has been diagnosed with Conversion Disorder and continues to experience seizures and other trauma-related symptoms as a result of Defendant Erick Kristianson's sexual abuse. She is prescribed medication and treats with a psychotherapist.

**JOINT AND SEVERAL LIABILITY**

243.     Defendants are jointly and severally liable for the damages and injuries sustained by Plaintiff, as Defendants' individual and collective actions and

omissions actually and proximately caused Plaintiff's past, present, and ongoing injuries. Plaintiff is entitled to damages pursuant to the laws of the State of Florida and the United States of America, including but not limited to the following:

    a.  Compensatory, actual, and consequential damages;

    b.  Statutory damages;

    c.  Punitive damages;

    d.  Reasonable attorneys' fees and costs;

    e.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT I
## VIOLATION OF THE PROTECTING YOUNG VICTIMS FROM SEXUAL ABUSE ACT, 18 U.S.C. §2255
## (ALL DEFENDANTS)

244.    Plaintiff Jane Doe 2 hereby realleges paragraphs 1-243 as if repeated verbatim herein.

245.    This claim is brought against all Defendants, with the specific acts complained of performed against minors by Defendants Champion Elite, Hughes and Kristianson and enabled by the ongoing certification and ratification of the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital.

246.     Under the statute, a covered individual means an adult who is authorized by a national governing body, a member of a national governing body, or an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a national governing body, a member of a national governing body, or such an amateur sports organization.

247.     Under the statute, the term "event" includes travel, lodging, practice, competition, and medical treatment.

248.     Defendants Champion Elite, Hughes, and Kristianson, qualify as covered individuals and the facts of this case bear out that abuse occurred at events defined by the statute.

249.     Defendant Champion Elite and Defendant Hughes were held out by the Varsity Defendants, Defendant USASF, Defendant USA Cheer, Defendant Charlesbank, and Defendant Bain Capital as being members and part of a network of safe and trustworthy cheer coaching gyms.

250.     Plaintiff was a minor at the time she was sexually abused and assaulted in contravention of 18 U.S.C § 2422, thus constituting violations of 18 U.S.C. §2255.

251.     Plaintiff has suffered personal injuries as a result of these violations of law.

252.     Plaintiff is entitled to damages pursuant to the laws of United States of America, including but not limited to the following:

   a.  Compensatory, actual, and consequential damages, or, in the alternative, liquidated damages in the amount of $150,000;

   b.  Reasonable attorneys' fees and costs;

   c.  Punitive damages; and

   d.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT II
### FOR CIVIL CONSPIRACY IN VIOLATION OF THE RICO ACT PURSUANT TO 18 U.S.C. §1962(c) and §1962(d) (ALL DEFENDANTS)

253.     Plaintiff Jane Doe 2 hereby realleges paragraphs 1-243 as if repeated verbatim herein.

254.     This count is brought against all Defendants.

255.     United States law makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…" 18 U.S.C. §1962(c).

256.     Each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each of them is capable of holding, and does hold, "a legal or beneficial interest in property."

257.     Defendants' activities include at least two (2) acts of racketeering activity since at least 2003. Accordingly, Defendants' conduct constitutes a pattern of racketeering activity. 18 U.S.C. § 1961(5).

258.     The racketeering activity is set forth in paragraphs 26-204 and includes violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud)[19] and 18 U.S.C § and 2422, (sexual exploitation of minors) as set forth in paragraph 212.

---

[19] As referred to herein, the following paragraphs set forth factual allegations that constitute mail fraud and/or wire fraud: 43, 4, 5, 6, 31, 49, 50, 51, 53, 55, 58, 59, 60, 63, 64, 66, 71, 72, 73, 74, 75, 76, 77, 78, 81, 82, 86, 87, 88, 90, 93, 94, 95, 98, 111, 119, 120, 121, 124, 127, 130, 134, 137, 139, 141, 142, 143, 144, 145, 146, 147, 154, 159, 165, 170, 171, 174, 175, 178, 182, 184, 185, 187, 188, 190, 193, 194, 208, 210, 212, 213, 216, 249

259.     In or around 2002, the Varsity Defendants, Defendant USASF, Defendant Champion Elite and Defendant Hughes formed an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4).

260.     Defendant Charlesbank and Defendant Bain Capital agreed to facilitate this Enterprise by funding its ongoing operation in order to obtain significant financial benefits worth billions of dollars.

261.     This Enterprise as previously described in this Complaint, consists of a group of persons associated together for the common purpose of recklessly, intentionally, and willfully endangering the Plaintiff as a minor athlete by exposing her to illegal sexual abuse and exploitation of children while continuously and repeatedly taking money from Plaintiff, and also assuring her parents and/or guardians she was particularly safe in order to take this money.

262.     The Defendants, and all of them in concert with the Enterprise, were engaging in misleading and fraudulent messaging to children and their families which they knew or should have known endangered children who were not in a position to discover the danger since Defendants were concealing the danger and failing to report it, acting in reckless indifference to the safety of the children in the name of growing profits.

263.    In 2014, Defendant Charlesbank funded the purpose of this Enterprise.

264.    In 2018, Defendants Bain Capital took over a role in funding the purpose of this Enterprise in place of Defendant Charlesbank.

265.    The Varsity Defendants, Defendant USASF, Defendant USA Cheer, and the Defendants Champion Elite and Hughes acted in concert to commit the predicate acts of mail fraud and wire fraud as set forth in the preceding paragraphs.

266.    The funding, materials, and premises provided by the Varsity Defendants, Defendant Charlesbank, and Defendant Bain Capital and the communication of particular trust and safety carried out by Defendant USASF facilitated the commission of these predicate acts by Defendant Champion Elite and Defendant Hughes, which allowed for Defendant Kristianson to commit sexual crimes against Jane Doe 2.

267.    The Defendants knew or should have known that inappropriate contact was occurring between credentialed coaches and minor athletes based on seeing the inappropriate contact, as well as the one-on-one coaching being marketed and the travel of these children across state lines with coaches, as well

as rumors of misconduct, some of which has even been captured on camera, engaging in illegal and inappropriate acts with the minors.

268.    The Defendants owed a duty to the minor Plaintiff, and her family, to disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

269.    The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

270.    The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

271.    The fraudulent mail and/or wire messages include, for specificity, but are not limited to the following:

a.  USASF 2009 Professional Responsibility Code and annual updates;

b.  USASF Athlete Protection Messaging at the website and via email on November 16, 2017;

c.  The 2020 Uniform Ineligible List, which Defendants falsely represented was a mechanism by which Defendants were properly patrolling and purging the sport of potentially dangerous adults;

d.  Social media posts and images either promoted by or shared by Defendants, where Defendants supported the proliferation of Defendants Champion Elite and Jones, and individual coaches;

e.  Marketing targeted toward minors and child athletes and specifically recruiting these athletes to travel over state lines to member gyms, and for camps, and competitions;

f.  The creation of "Cheerlebrity," as a means to attract new minor athletes;

g.  Annual coach credentialing for Defendant Kristianson;

h.  Annual credentialing for Champion Elite's owner Ashley Hughes;

i.  Annual gym credentialing for Defendant Champion Elite;

j.  Fees accepted by USASF and/or the Varsity Defendants from Defendant Hughes;

k.  Fees accepted by USASF and/or the Varsity Defendants from or on behalf of Defendant Kristianson;

l.  Fees accepted by USASF and/or the Varsity Defendants from or on behalf of Defendant Champion Elite;

m. Annual billing and/or invoices to Plaintiff for her USASF membership renewal;

n. Billing and/or continuing to receive payment from Plaintiff for uniforms, and other requisites of competition;

o. Billing, invoicing, and/or fees for music, choreography, travel, and hotels;

p. Explicit imagery sent to Plaintiff Jane Doe 2 while she was a minor and depicting nude adults;

q. In 2021, USASF's website falsely claimed that they were requiring background checks in 2015 of "all coaches and adult members." However, this was untrue. Background checks were only required for entry into the "warm up room" at competitions. It was never implemented with respect to coaching children or being around them in any capacity outside their competition routine.

r. In 2021, USASF indicated that it was partnering with the U.S. Center for SafeSport ("SafeSport") as part of its responsibility to athletes to prevent sexual abuse; however, and upon information and belief, the

USASF has yet to implement the requisites of SafeSport for its coaches, vendors, and volunteers.

s. Consecutively, on May 10, 2018 and May 16, 2019, the period just before Worlds at Disney, USASF disseminated the following messaging: "Athlete Safety is our #1 Priority! Our mission includes 'strive for a safe environment for our athletes.' To the USASF, safety extends beyond our Cheer or Dance safety rules for performance. We're committed to helping our members create the safest overall environment for every all-star athlete, so we've made resources available for use in gyms and studios."

t. Defendants' concerted efforts to prevent all-star cheer from being designated a "sport," which would have interrupted the Varsity Defendants' profits through regulation;

u. The Varsity Defendants' representations related to USASF and adoption of SafeSport;

v. USASF's representations related to the benefits of competing at "sanctioned events," which was a proxy for Varsity events;

peech

w. Continued messaging by USASF that child sexual abuse and exploitation by predators was an outside problem that could be prevented by paying more attention to how cheerleaders were presenting themselves on social media.

x. In July of 2019, USASF shifted the blame to child athletes warning them the "risk and responsibility" of sexual exploitation and objectification required them to "make better choices" about their appearance to "minimize the risk[.]" It did this with full knowledge of repeated reports that the industry was rife with abuse among its own coaching and gym owner ranks and that they were actively concealing these predators so that they could continue to feed the revenue stream.

y. USASF's athlete protection messaging continued at this time to primarily address athlete safety from sexual exploitation and abuse from the perspective of how athletes were presenting themselves through appearance and how that might affect the brand's image through an "image and appearance policy."

z.  USASF and USA Cheer codes of conduct and other policy statements, which operated across all Varsity-affiliated gyms, which touted that athlete safety was a priority, when, in fact, neither entity had uniform methods by which to ensure athlete safety;

aa. Materials associated with Varsity University, a gym and coaching conference;

bb. Such additional statements, messages, and/or materials as may be revealed during discovery in this matter.

272.   Plaintiff Jane Doe 2 had a property interest in her membership dues paid as set forth above and other fees and costs, and in the continued ability to cheer competitively, and Defendants induced Plaintiff Jane Doe 2 through promises of social media notoriety, "Cheerlebrity" status, scholarship opportunities, and, to become a cheer coach herself and obtain the "legend status" her coaches boasted of, to become a gym owner, or to become an event promoter.

273.   The actions of the Enterprise and its conspirators were the direct and proximate cause of these injuries to the Plaintiff.

274. But for the fraudulent assurances to Plaintiff Jane Doe 2's parents that the gyms and coaches were certified safe, the abuse would not have occurred causing the injuries described above.

275. Plaintiff is entitled to damages pursuant to the laws of the United States of America, including but not limited to the following:

a. Compensatory, actual, and consequential damages, trebled in accordance with the statute;

b. Reasonable attorneys' fees and costs;

c. Punitive damages; and

d. Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## COUNT III
### GROSS NEGLIGENCE
### (ALL DEFENDANTS)

276. Plaintiff hereby realleges paragraphs 1-243 as though repeated verbatim herein.

277. Plaintiff brings this claim for gross negligence against all Defendants.

278. At all times relevant to this Complaint, Defendants have been responsible for the safety, health, and welfare of minor athletes, such as Plaintiff, who were members of Defendants USASF, and USA Cheer, participants in

Defendant Varsity events, competing for Varsity-affiliated gyms, and under the care, custody, and control of each of the Defendants, respectively.

279.     At all times relevant to this complaint, Defendant USASF, the Varsity Defendants, and Defendant Champion Elite have represented that credentialing generally, and specifically related to coaches, provided superior safety for athletes such as Jane Doe 2.

280.      At all times relevant to this complaint, Defendants have been aware that there are dangers associated with coaches training minor athletes, including risks associated with inappropriate, and non-consensual sexual touching, emotional, and physical abuse.

281.     At all times relevant to this Complaint, Defendants represented that they had rules, policies and/or procedures specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches, and adults who interact with these athletes by virtue of the adults' position of power. These policies, procedures, rules, and/or guidelines included representations related to SafeSport, and that Defendants USASF and USA Cheer were uniquely situated to help govern and regulate All-star cheer.

282.     At all times relevant to this complaint, Defendants have represented that competing on behalf of the system governed by Defendant USASF and USA Cheer is the means to maximize athlete protection for minor athletes such as Plaintiff Jane Doe 2.

283.     At all times relevant to this complaint, Defendants owed special duties to protect minor children, such as Plaintiff Jane Doe 2, who was an athlete competing on behalf of a credentialed member club. Plaintiff Jane Doe 2 by and through her mother Mary Doe entrusted Defendants with Plaintiff Jane Doe 2's physical, mental, and emotional care and well-being, and Defendants held themselves out as being uniquely able to protect minors such as Plaintiff Jane Doe 2 from harm caused by physical or other abuse.

284.     Despite this, at all times relevant to this Complaint, Defendants have been aware that violations to their internal policies, processes, procedures, and guidelines related to athlete safety, and, in particular, safety against harm from sexual, physical, and emotional abuse and exploitation has happened on a regular and continuous basis by and through USASF and USA Cheer certified coaches at private all-star gyms, including Defendant Champion Elite.

285.     Defendants violated their responsibilities and duties to Plaintiff Jane Doe 2 in one or more of the following particulars:

a.   Allowing Defendant Kristianson access to Plaintiff Jane Doe 2 when Defendants knew or reasonably should have known that Defendant Kristianson posed a threat of harm to Plaintiff Jane Doe 2;

b.   Permitting Defendant Kristianson to remain in a position of power and particular trust over minor athletes, such as Plaintiff Jane Doe 2;

c.   Allowing Defendant Kristianson to isolate Plaintiff Jane Doe 2 despite the known dangers associated with one-on-one coaching and interactions;

d.   Failing to enforce social media and other communications policies and procedures related to inappropriate conduct between minor athletes and coaches such as Plaintiff Jane Doe 2 and Defendant Kristianson;

e.   Failing to report known instances of abuse or misconduct;

f.   Failing to adhere to SafeSport policy or procedure;

g. Failing to investigate potential misconduct, including among and between Defendant Kristianson and Plaintiff Jane Doe 2, despite knowledge that such inappropriate contact had occurred;

h. Failing to train, supervise, monitor, or implement policies and procedures related to Defendants' employees and/or authorized representatives and their interactions with minors such as Plaintiff Jane Doe 2;

i. Failing to provide safe premises;

j. Failing to protect Plaintiff Jane Doe 2 from the foreseeable harm inflicted on her by a third party;

k. Continuing to hold Defendant Kristianson out as a credentialed, and thus trustworthy, adult in the enterprise; and

l. Such other conduct as may be revealed.

286. At all times relevant to this complaint, Defendants have known that one-on-one coaching, and intimate coach contact is an enhanced feature of private gym cheer coaching that generates a great deal of money for all Defendants in the enterprise.

287.     Defendants are also aware of the close personal relationships many of these coaches form with minor athletes who the coaches gain access to by virtue of their USASF and USA Cheer credentials.

288.     Defendants are further aware that, despite the known dangers of one-on-one contact, coaches routinely engage in intimate and exclusive contact with minor athletes, as well as travel with minors across state lines, even staying in the same hotel rooms with no other chaperone, during these moneymaking cheer competition events which enrich the enterprise.

289.     And when complaints or reports have surfaced, or social media images and videos circulate depicting illegal activity with minors, the Defendants disregard or ignore same, do not report to any agencies, do not permanently strip coaches of their eligibility, and often rally around coaches who have been accused of illegal conduct with minors, even ostracizing families who have complained or reported.

290.     Defendants' actions and omissions, by and through their authorized agents, were unreasonable, constituted the total absence of care, and breached duties owed to Plaintiff, and actually and proximately contributed to and/or caused damages.

291.    Defendants' actions and omissions as described above, by and through authorized agents, were in violation of Defendants' own policies, procedures, and what would be reasonable under the circumstances.

292.    Each incident of abuse and exploitation detailed in this matter constitutes a separate occurrence.

293.    Plaintiff is entitled to damages pursuant to the laws of Florida, including but not limiting to the following:

a.  Compensatory, actual, and consequential damages;

b.  Punitive damages; and

c.  Any and all other and further relief as this Court may deem appropriate including pre and post judgment interest.

## COUNT IV
### NEGLIGENT SUPERVISION
### (VARSITY DEFENDANTS, DEFENDANT USASF, DEFENDANT USA CHEER, DEFENDANT CHAMPION ELITE, AND DEFENDANT HUGHES)

294.    Plaintiff hereby realleges paragraphs 1-243 as though repeated verbatim herein.

295.    Throughout the relevant timeframe of this complaint, Defendant USASF, the Varsity Defendants, and Defendants Champion Elite and Hughes continued to employ, credential, and place Defendant Kristianson in a particular

and unique position of trust by allowing him access to minor athletes, such as Plaintiff Jane Doe 2.

296.     Despite claiming to conduct background checks and remove eligibility certification from coaches or gyms where complaints or reports of misconduct have been made, Defendants continue to let Defendant Kristianson operate and manage Defendant Champion Elite and to provide coaching services in order to generate income for the enterprise.

297.     Furthermore, when Defendants became aware of allegations against Defendant Kristianson, either of sexual misconduct, or that he had engaged in inappropriate behavior in the gym by, to wit, exposing himself to child athletes. Defendants failed to report these activities to law enforcement agencies, or to take any other corrective action, instead preserving the reputation of the enterprise so that trust in its safety continued to generate income for the enterprise.

298.     Defendants' business model relies upon certifying private gyms and coaches pursuant to the USASF standard, which purports to place athlete health and safety above all else.

299.     Moreover, Defendant Champion Elite's business model relies upon access to credentialed coaches, and coaches who are extremely popular in the sport, to attract and perpetuate new athletes.

300.      In perpetuating a business model built on trust and athlete safety, Defendants specifically undertook a duty to ensure that reputation for trust and safety was earned and that dangerous individuals committing atrocious illegal acts were removed from the competitive cheer network Defendants oversaw.

301.     Defendants breached this duty in a number of particulars including by credentialing Defendant Kristianson, and allowing him to remain in a gym setting with regular access to minor athletes, when Defendants knew or should have known he posed a significant threat of harm, failing to act or otherwise disregarding reports of abuse, discounting or otherwise ignoring specific information about Defendant Kristianson and his inappropriate interaction with Plaintiff Jane Doe 2, among other particulars.

302.     Defendants' grossly negligent, willful and wanton conduct, set forth more fully herein, directly and proximately caused Plaintiff's injuries.

303.     As a direct and proximate result of Defendants' conduct, the Plaintiff has sustained physical, mental, and emotional damages, among others.

304.    Plaintiff is therefore entitled to a judgment against Defendants, and for such actual and consequential damages in an amount to be determined by a jury trial.

## COUNT V
## ASSAULT/BATTERY
## (DEFENDANT CHAMPION ELITE, DEFENDANT HUGHES, AND DEFENDANT KRISTIANSON)

305.    Plaintiff hereby realleges paragraphs 1-243 as though repeated verbatim herein.

306.    Defendants Champion Elite and Defendant Hughes as owners and operators of Defendant Champion Elite, allowed an adult coach to access minor athletes including Plaintiff Jane Doe 2 and to illegally commit unwanted and nonconsensual sexual touching of the Plaintiff Jane Doe 2 and others.

307.    Said touching by Defendant Kristianson constituted sexual assault and sexual battery on this named Plaintiff and others.

308.    As a direct and proximate result of these Defendants' conduct, set forth more expressly above, Plaintiff Jane Doe 2 experienced bodily injury, physical pain and suffering, and mental anguish and is entitled to an award of actual damages in an amount to be determined through a trial of this matter.

## COUNT VI
## BREACH OF CONTRACT
## (AS TO THE VARSITY DEFENDANTS, DEFENDANTS USASF, AND DEFENDANT CHAMPION ELITE)

309.     Plaintiff realleges paragraphs 1-243 as though repeated verbatim herein.

310.     At all times relevant to this complaint, Plaintiff had duly executed contracts with Defendant Champion Elite, the Varsity Defendants and Defendant USASF where, in exchange for valuable consideration from Plaintiff, Defendants agreed to provide a competitive and gym environment that was safe, secure, and free from harm, specifically physical and sexual abuse.

311.     As set forth herein, during the course of these contractual agreements, Plaintiff was subjected to severe and oppressive abuse, physically and mentally, including during competitions hosted by the Varsity Defendants under the governance of Defendant USASF, and which Plaintiff Jane Doe 2 was required to attend by Defendant Champion Elite.

312.     During the term of these agreements, Defendant Champion Elite, the Varsity Defendants and Defendant USASF failed to provide Plaintiff with a safe and secure environment, including by failing to enforce the policies, procedures,

and standards expressly adopted by Defendant USASF related to credentialed coaches.

313.    These failures on the parts of the Varsity Defendants and Defendant USASF constitute violations of the fundamental and material terms of the agreements between Plaintiff, and the Varsity Defendants and Defendant USASF.

314.    The Varsity Defendants' and Defendant USASF's failures were so egregious and unconscionable as to render the agreements null and void.

315.    As such, Plaintiff seeks an order from this court finding that Defendants' conduct constitutes a breach of the contractual arrangement between Defendants and Plaintiff, rescinding said contracts, and remitting the valuable consideration Plaintiff paid to Defendants during the relevant timeframe, as well as for all such attorney's fees, costs, and interest to which Plaintiff may be entitled.

## COUNT VII
### UNJUST ENRICHMENT
### (AS TO DEFENDANT CHAMPION ELITE, THE VARSITY DEFENDANTS, DEFENDANT BAIN CAPITAL, AND DEFENDANT CHARLESBANK)

316.    Plaintiff realleges paragraphs 1-243 as though repeated verbatim herein.

317.    As set forth herein, the cheer industry represents a multi-billion-dollar enterprise where each young athlete annually spends thousands of dollars

toward gym memberships, private lessons, uniforms, accessories, competition fees, and membership with USASF.

318.     At all times relevant to this complaint, Plaintiff conferred non-gratuitous benefits upon Defendants including annual competition and membership fees, as well as continuous revenue toward uniforms, accessories, private training, and other monetary benefits.

319.     Defendants realized the value of these benefits, including steady annual revenue per athlete.

320.     To date, none of the benefits Defendants realized have been returned or otherwise disgorged.

321.     Under the circumstances set forth herein and above, it would be inequitable for Defendants to retain the benefits conferred by Plaintiff including through Plaintiff's annual membership fees and competition fees.

322.     Plaintiff is therefore entitled as a matter of equity to recover these benefits from Defendants and for all such additional relief as this Court deems proper.

## COUNT VIII
### FRAUD
### (AS TO DEFENDANTS CHAMPION ELITE, THE VARSITY DEFENDANTS, AND DEFENDANT USASF)

323.     Plaintiff realleges paragraphs 1-243 as though repeated verbatim.

324.     At all times relevant to this complaint, Plaintiff was a party to numerous annual contracts whereby Plaintiff agreed to pay Defendants annual and recurring fees in exchange for a safe competitive environment and training facility, and further agreed to pay substantial additional consideration and fees to Defendants.

325.     As part of these agreements, Defendants represented to Plaintiff that Defendants would be responsible for ensuring a safe environment and access to safe adults for Plaintiff including an environment free from, and coaches who would not engage in, sexual, physical, and mental harm and exploitation.

326.     Defendants' promises were material to Plaintiff's agreements, without which no agreements would have existed.

327.     Plaintiff had a right to rely upon Defendants' promises.

328.     As set forth herein, even at the time they entered into the agreements with Plaintiff, Defendants knew or had a reckless disregard for whether the environment they provided at competitions, in the gym environment, and through certified coaches, was safe and free from harm and sexual, physical and mental abuse.

329.     In fact, at all times relevant to this complaint, Defendants knew that the environment they provided actually facilitated access by predators, including coaches, to underage athletes by predators, including coaches, choreographers, and other adults.

330.     Yet, with knowledge or a reckless disregard for whether Defendants were providing safe environments for child athletes, Defendants nevertheless entered into the agreements and began collecting fees from Plaintiff.

331.     Upon information and belief, Defendants' misrepresentations included, without limitation:

   a. Certifying to Plaintiff that Defendants were responsible for providing safe competitive and training environments;

   b. Certifying to Plaintiff and her family that the adults involved in the gyms, and competitions, including coaches, had been duly vetted;

   c. Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had exhibited disturbing behavior;

   d. Facilitating an unchaperoned environment for child-athletes;

    e.  Encouraging coaches to create a steady stream of new child athletes for the time that the current athletes aged out;

    f.  Failing to provide appropriate security to ensure a safe environment for child athletes free from harm;

    g.  Failing to enforce, implement, or abide by policies and procedures related to vetting, security, and screening;

    h.  Such additional conduct as may be revealed during discovery and the trial of this case.

332.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain significant mental, physical, and emotional injuries and damages.

333.    Plaintiff now seeks an order from this court setting aside the referenced agreements and declaring them null and void, as well as for damages in an amount to compensate Plaintiff for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

**<u>COUNT IX</u>**
**NEGLIGENT SECURITY**
**(AS TO THE VARSITY DEFENDANTS, DEFENDANT CHAMPION ELITE, DEFENDANT BAIN CAPITAL & DEFENDANT CHARLESBANK)**

334.    Plaintiff realleges paragraphs 1-243 as though repeated verbatim herein.

335.    At all times relevant to this complaint, the Varsity Defendants, Defendant Bain Capital, Defendant Champion Elite, and Defendant Charlesbank sponsored, created, hosted, and oversaw private all-star gyms, camps, coaches, and competitions where young adult athletes would converge at pre-determined locations, all established and governed by Defendants, and under the supervision of Defendants.

336.    At all times relevant to this complaint, if athletes competed at the private all-star gyms, camps and competitions hosted by Defendant Champion Elite, the Varsity Defendants, and Defendants Bain Capital and Charlesbank, the athletes had no meaningful choice but to attend at the locations, and under conditions, established by Defendants.

337.    The Varsity Defendants, Defendant Champion Elite, and Defendants Bain Capital and Charlesbank received substantial revenue from these events.

338.    As part of their promotion of these events, the Varsity Defendants, Defendant Champion Elite, and Defendants Bain Capital and Charlesbank undertook a responsibility to ensure that the locations and events were safe for

attendees, minor athletes who were likely to encounter adult coaches, choreographers, videographers, and attendees.

339.    The Varsity Defendants, Defendant Champion Elite, and Defendants Bain Capital and Charlesbank violated their responsibility to provide safe premises free from harm from third parties in one or more of the following particulars:

a.  Disparate enforcement of policies, procedures, and guidelines related to coaching suspension, with the result that coaches were still allowed to attend Varsity Competitions and represent Varsity-affiliated private all-star gyms;

b.  Failure to provide adequate monitoring;

c.  Failure to provide sufficient background checks, with the result that hundreds of potential predators were allowed to gain access to underage athletes;

d.  Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol at all-star Gyms, and while attending Varsity events;

e.  Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic images while competing on behalf of Varsity-affiliated gyms, and attending Varsity events;

f.  Failing to ensure that Varsity member coaches were not forcing themselves upon minor athletes, including at Varsity member gyms and Varsity events;

g.  Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults affiliated with Defendants;

h.  Such additional conduct as may be revealed during discovery.

340.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain significant mental, physical, and emotional injuries and damages.

341.    Plaintiff now seeks an order from this court for damages in an amount to compensate Plaintiff for the physical, psychological and emotional harm caused

by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## COUNT X
## CIVIL CONSPIRACY
## (AS TO ALL DEFENDANTS)

342.   Plaintiff realleges paragraphs 1-243 as though repeated verbatim herein.

343.   At all times relevant to this complaint, Defendants were a collective group of individuals working in concert and individually toward a common plan.

344.   As described more fully herein, Defendants, acting as a collective group and individually, and at all times relevant to this complaint, were engaged in the process of recklessly, intentionally, and willfully endangering the Plaintiff, a minor athlete, by exposing her to sexual abuse and exploitation while assuring her and her family that Defendants were providing safe conditions and premises for the athletes to compete.

345.   As described more fully herein, Defendants' conduct included misleading and fraudulent messaging to children and their families which Defendants knew or should have known would endanger children who were not in a position to discover the danger since Defendants were concealing the danger

and failing to report it, and acting in reckless indifference to the safety of the children in the name of growing profits.

346.    At all times relevant to this complaint, Defendants were motivated by the substantial revenue, profits, and funding paid by the athletes and their families in exchange for the fraudulent messages and misrepresentations made by Defendants.

347.    In 2014, Defendant Charlesbank funded this scheme, providing additional capital for Defendants to perpetuate their misrepresentations.

348.    In 2018, Defendants Bain Capital took over the primary role in funding the purpose this scheme. Defendant Charlesbank retained an interest however in the misrepresentations and resultant monetary benefits.

349.    Defendants acted in concert to perpetuate this scheme.

350.    In addition, Defendants knew or should have known that the funding, materials, and premises provided by Defendants were material to the abuses and harm suffered by the minor athletes, as well as the continued perpetuation of revenue from these athletes.

351.    The Defendants knew or should have known that inappropriate contact was occurring between coaches, choreographers, videographers, and other

adults and minor athletes based on the one-on-one coaching being marketed and the travel of children across state lines with their coaches, some of whom stayed in hotel rooms with them and had been rumored, and even captured on camera, engaging in illegal and inappropriate acts with the minors.

352.   The Defendants owed a duty to minors including Plaintiff Jane Doe 2, and her family, to make reports or disclose reports of inappropriate behavior and sexual relationships with children and to report crimes alleged against them.

353.   The Defendants collectively allowed, endorsed, and financially supported the continuation of these acts against minor athletes.

354.   The Defendants engaged in a scheme to defraud these athletes and their families out of money and property with their artifice and deceit regarding the safety of their programs.

355.   But for the fraudulent assurances to her parents that the gyms and coaches were certified safe, the abuse would not have occurred, and Plaintiff would not have suffered continued economic harm derived from paying substantial dues and fees predicated in large part on promises of a safe environment for minor athletes.

356.   As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to damages including but not limited to the following:

a.   Compensatory, actual, and consequential damages, trebled in accordance with the statute;

b.   Punitive damages; and

c.   Any and all other and further relief as this Court may deem appropriate including pre- and post-judgment interest.

## COUNT XI
## RESPONDEAT SUPERIOR
## (AS TO DEFENDANT CHAMPION ELITE)

199.   Plaintiff hereby realleges paragraphs 1-243 as though repeated verbatim herein.

200.   At all times relevant to this complaint, Defendant Champion Elite employed and retained Defendant Hughes, as well as Defendant Kristianson as a coach, and authorized Defendant Kristianson's access to minor athletes including Plaintiff Jane Doe 2.

201.   At all times relevant to this complaint, Defendants Hughes and Kristianson were acting in the course and scope of their employment, as authorized representatives of Defendant Champion Elite.

202.    As such, at all times relevant to this complaint, Defendant Champion Elite was as responsible for the actions, inactions, omissions and failures of Defendants Hughes and Kristianson as though they undertook the actions of the Defendant coaches themselves.

203.    As set forth herein, Defendant Hughes failed to properly train, supervise, provide monitoring, and/or to implement the policies, procedures, and guidelines of Defendant Champion Elite, greatly increasing the likelihood of bodily injury and harm to athletes such as Plaintiff Jane Doe 2.

204.    As set forth herein, Defendant Kristianson committed grotesque criminal acts against Plaintiff Jane Doe 2 including physical, mental, and emotional abuse, sexual exploitation, assault, and other battery.

205.    This conduct directly and proximately caused Plaintiff Jane Doe 2 to sustain continuing and ongoing injuries, including physical and emotional damages.

206.    Plaintiff Jane Doe 2 therefore seeks an order from this court against Defendants, and is further entitled to actual, consequential, and such additional damages, including punitive damages as this court deems just and proper.

<u>**COUNT XII**</u>
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**
**(ALL DEFENDANTS)**

207.   Plaintiff Jane Doe 2 realleges paragraphs 1-243 as though repeated verbatim herein.

208.   As set forth herein and above, at all times relevant to this complaint, Defendants had a duty or duties to Plaintiff to use due and reasonable care to protect Plaintiff from foreseeable harm in a number of particulars, and not to inflict physical, emotional, or psychological injury upon the Plaintiff.

209.   As set forth herein and above, Defendants violated their responsibilities to Plaintiff Jane Doe 2 in one or more particulars, including:

    a.   Certifying to Plaintiff that Defendants were responsible for providing safe gyms and competitive environments;

    b.   Certifying to Plaintiffs and their families that the adults involved in the competitions and training, including coaches who were allowed to participate in competitions and training, had been duly vetted;

    c.   Allowing coaches to continue participating and accessing child-athletes even after Defendants knew the coaches had

exhibited disturbing behavior, such as Defendant Kristianson

exposing himself to minor athletes in the gym;

d.     Facilitating an unchaperoned environment for child-athletes;

e.     Fostering a party culture for child athletes, including an

environment where alcohol and drugs were readily available;

f.     Encouraging coaches to create a steady stream of new child

athletes for the time that the current athletes aged out;

g.     Failing to provide appropriate security to ensure a safe

environment for child athletes free from harm;

h.     Failing to enforce, implement, or abide by policies and

procedures related to vetting, security, and screening;

i.     Disparate enforcement of policies, procedures, and guidelines

related to coaching suspensions, with the result that coaches

such as Erick Kristianson were still not permanently banned

from interacting with minor athletes;

j.     Failure to provide adequate monitoring at the gyms, camps,

events and competitions;

k.     Failure to undertake sufficient background checks;

l.      Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to drugs and alcohol while attending Varsity events;

m.     Failing to monitor, enforce, or otherwise implement policies and procedures to ensure that minor athletes were not exposed to pornographic images, or were not solicited to provide pornographic images while attending Varsity events or cheering for or on the premises of USASF member-gyms;

n.      Exposing minor athletes to potential harmful adults with knowledge or a reckless disregard for the safety of the minor athletes;

o.      Failing to ensure that adult coaches and athletes were not forcing themselves upon minor athletes;

p.      Failing to ensure that underage athletes were not being forced into non-consensual sexual encounters with adults;

q.      Such additional conduct as may be revealed during discovery.

210.    Defendants' conduct set forth above is so outrageous as to go beyond all bounds of decency and is to be regarded as odious and utterly intolerable be unacceptable in a civilized community.

211.    Moreover, Defendants' conduct has directly and proximately caused serious, severe, and pervasive emotional and mental injury to Plaintiff Jane Doe 2 and will require reasonably certain future care.

212.    Plaintiff Jane Doe 2 now seeks judgment against Defendants and for damages in an amount to compensate her for the physical, psychological and emotional harm caused by Defendants' conduct, as well as punitive damages, and such additional damages in law or equity as this court deems proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court award the following damages, jointly and severally against Defendants, as provided by the laws of the United States and Florida, including but not limited to the following:

a.    Compensatory, actual, and consequential damages to Plaintiff, trebled where permitted by statute;

b.    Alternatively, liquidated damages as to Count I;

c.    Costs of this action and attorneys' fees to Plaintiff;

d.  Punitive damages where permitted; and,

e.  Any and all other and further relief as this Court may deem appropriate.

**TRIAL BY JURY**

WHEREFORE, Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 17th day of November 2022.

**OSBORNE & FRANCIS, PLLC**

*s/ Gregorio Francis*
Gregorio Francis, Esq. (FL Bar No: 0008478)
J. Robert Bell III, Esq. (FL Bar No: 115918)
805 S. Kirkman Road, Suite 205
Orlando, Florida 32811
Phone: (407) 993-6952
Email:  gfrancis@realtoughlawyers.com
         rbell@realtoughlawyers.com
         dmonahan@realtoughlawyers.com

*Attorneys for Plaintiff*

**STROM LAW FIRM, LLC**

*s/ Bakari T. Sellers*
Bakari T. Sellers (SC Fed. ID No. 11099)*
Jessica L. Fickling (SC Fed. ID No. 11403)*
Alexandra Benevento (SC Fed. ID No. 10734)*
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone: (803) 252-4800
Email:     bsellers@stromlaw.com
           jfickling@stromlaw.com
           abenevento@stromlaw.com

*Attorneys for Plaintiff*

\* PHV Petitions Forthcoming